# EXHIBIT 1

```
 1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3    PERCY R. TAYLOR,                )
                                      )
 4                    Plaintiff,      )
                                      )
 5             -vs-                   )  No. 13 C 1856
                                      )
 6    COOK COUNTY SHERIFF'S OFFICE,   )
      et al.,                         )  Chicago, Illinois
 7                                    )  October 24, 2017
                      Defendants.     )  9:00 a.m.
 8

 9                    TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE ANDREA R. WOOD
10
      APPEARANCES:
11
      For the Plaintiff:       LAW OFFICES OF RICHARD LINDEN
12                             17 North Wabash, Suite 400
                               Chicago, Illinois  60602
13                             BY:  MR. RICHARD F. LINDEN

14                             LAW OFFICES OF PETER V. BUSTAMANTE
                               17 North State Street, Suite 1550
15                             Chicago, Illinois  60602
                               BY:  MR. PETER VINCENT BUSTAMANTE
16
      For Defendant Dart,
17    Cook County Sheriff's
      Office, Defendants
18    Ways, Whittler
      and Smith:               HINSHAW & CULBERTSON LLP
19                             222 North LaSalle Street, Suite 300
                               Chicago, Illinois  60601
20                             BY:  MS. VIRGINIA BRETTE BENSINGER

21

22               COLETTE M. KUEMMETH, CSR, RMR, FCRR
                        OFFICIAL COURT REPORTER
23                     219 South Dearborn Street
                              Room 1928
24                   Chicago, Illinois  60604
                           (312) 554-8931
25
```

```
 1    APPEARANCES:   (Continued)

 2
      For Defendants Ernst,
 3    Fitzgerald, and Estate
      of Patrick Murphy:        ROCK, FUSCO & CONNELLY, LLC
 4                              321 North Clark Street, Suite 2200
                                Chicago, Illinois  60654
 5                              BY:  MS. CATHERINE MACNEIL BARBER

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      (Proceedings heard in open court: )

2      THE CLERK:  Calling case 13 CV 1856, Taylor versus

3   Cook County.

4      MR. BUSTAMANTE:  Good morning, your Honor.  Peter

5   Bustamante on behalf of the plaintiff.

6      MR. LINDEN:  Good morning, your Honor.  Rick

7   Linden, also on behalf of plaintiff.

8      MS. BARBER:  Catherine Barber for Defendants Ernst,

9   Fitzgerald, and Estate of Patrick Murphy.  Good morning.

10     MS. BENSINGER:  Good morning, your Honor.  Brette

11  Bensinger on behalf of Sheriff Dart, Cook County Sheriff's

12  Office, Defendant Ways, Whittler, and Smith.

13     MR. BUSTAMANTE:  Your Honor, mea culpa, we had a

14  lot of difficulty because of a move that's not yet

15  accomplished.  It will be finalized this Thursday.

16  Difficulties with internet, telephones, and therefore we did

17  not file the joint status report on time.  Although we did

18  meet and had a conference and had an agreement.

19     I have been informed by counsel today that I filed

20  the wrong report.  Or attached the wrong report for the

21  motion for leave.  So I suggest that they have the right

22  report, if the Court grants us leave, they can file it.  I

23  frankly thought I was filing the right report.

24     THE COURT:  What is the difference between the two

25  reports?

1       MS. BENSINGER:  Your Honor, there were a few edits,

2    just word changes, and then the attachment of the exhibit,

3    which is critical to the report.  And the exhibit is

4    plaintiff's responses to the interrogatories that we issued.

5    And we have significant problems with plaintiff's responses

6    to the interrogatories.  And that should have been included

7    as an exhibit.

8       We've got significant problems with these guys

9    taking this case seriously.  I mean, we received a draft

10   report, joint draft report -- it was due on Friday, the 13th.

11   I sent emails, you know, requesting it, and didn't get a

12   draft until after 3:00 p.m. on Friday when we were supposed

13   to file it.  And the draft was totally, you know,

14   inconsistent with your order, and we wouldn't sign on to it.

15   And then we received a revised report from plaintiffs that

16   following Monday, and we provided our edits later that day.

17       We didn't get another -- you know, they ignored our

18   followups and filed a completely different report yesterday.

19       So I just feel like they're not taking this case

20   seriously, they're not taking my co-counsel and I seriously,

21   and it's really been a significant struggle, your Honor.

22       THE COURT:  Okay.  So if you weren't getting a

23   draft report from plaintiff's counsel, why didn't you just

24   draft your own?  It's a joint report, so I didn't indicate

25   that one party or the other should be primarily responsible

1    for preparing it.

2             MS. BENSINGER:  We sent emails saying that we would

3    plan on filing the report ourselves.  And didn't receive a

4    response.  We figured it was probably -- we wanted to make

5    sure that we were on the up-and-up and had an agreement by

6    the opposing side to file anything.  I mean, we certainly

7    could have filed something just indicating our side of the

8    issues, but...

9             MS. BARBER:  I think what we're saying is that we

10   didn't think that that would be helpful to the Court since

11   that was not what the Court had asked for.  And the way that

12   plaintiff had given us a draft, we felt compelled to have to

13   respond to each of their -- so we just couldn't get it to be

14   on a joint level.

15            THE COURT:  So Mr. Bustamante, when you realized

16   that you were having logistical issues because of a move, why

17   didn't you ask defense counsel to take the lead on preparing

18   and filing the report?

19            MR. BUSTAMANTE:  Your Honor, I don't want to

20   misstate something, because my partner, Paula Giroux, was, in

21   fact, in touch -- I hope, hopefully, with opposing counsel.

22   My understanding was that we got the word it's your

23   obligation to send us a draft report.  And that's what we

24   did.

25            MS. BENSINGER:  No.  I mean --

1          MR. BUSTAMANTE:  That's what I heard.

2          MS. BENSINGER:  They've got three different law

3     firms, I think:  The Linden law firm, Bustamante, and

4     Ms. Giroux.  So I just don't understand how we didn't get a

5     draft report until Friday after 3:00 p.m.  There was no

6     expectation from us that we would -- we sent an email:  Are

7     you going to send the draft report?  What's going on?

8          MS. BARBER:  There was also a conversation, just to

9     be clear, I think this is what Mr. Bustamante -- could be

10    what Mr. Bustamante is talking about.  There was a deposition

11    scheduled last Thursday, and we did have a conversation about

12    the status report since we hadn't gotten a draft.  And I

13    asked for plaintiffs to give a draft that -- to see if they

14    could get it that day.  And Ms. Giroux said that she would

15    try.

16         So then we followed up on Friday, but we didn't

17    receive it until later in the day.

18         THE COURT:  Do the defendants have the correct

19    version of the report, what you believe to be the correct

20    version of the report?

21         MS. BARBER:  Yes.

22         THE COURT:  Do you have a copy that you can hand

23    up?

24         MS. BENSINGER:  I do, your Honor.

25         THE COURT:  Does plaintiff's counsel have a copy of

1    this report as well?

2         MS. BENSINGER:  Yes.  They received it last week.

3    I can give them a copy right here.

4         THE COURT:  Is this what you think you filed?

5         MR. BUSTAMANTE:  I have no objection.

6         MS. BENSINGER:  He should have read it last week

7    when he received it.

8         THE COURT:  I'm less concerned in the back and

9    forth between the parties and more concerned in making sure

10   that I have in front of me what is intended to be the actual

11   status report.

12        MS. BENSINGER:  The exhibit is attached to it, your

13   Honor.

14        THE COURT:  Because obviously if what was filed is

15   not what the defendants believe that they sent back, then

16   perhaps Mr. Bustamante didn't read it at the time for

17   whatever reason.

18        MR. LINDEN:  Your Honor, like I said, we apologize

19   for any confusion, but we were going back and forth with

20   drafts.  We tried, we intended to put the right draft in.

21   And we all read the draft.  And plaintiff never offered -- or

22   defense never offered their draft either, so it wasn't real

23   clear.  We agreed to take the lead, but they didn't help

24   things at all.

25        MR. BUSTAMANTE:  Rick, it doesn't really matter.

1    It just doesn't matter.

2         THE COURT:  Okay.  It looks like maybe the witness

3    list is a little different.

4         MS. BENSINGER:  Yes.

5         THE COURT:  And section 2 is perhaps a little

6    different, though I can't tell what the difference is.

7         Okay.  Let's talk about the actual issues and try

8    to get some of them resolved, and I'll figure out if there

9    are things that I'm just not up to speed on because I didn't

10   have the correct report or the exhibit.  I think at least

11   some of these issues we can discuss and hopefully resolve I

12   would think pretty quickly.  So let's talk about those.

13        The depositions that the plaintiff wants that the

14   defense is contesting, Sheriff Dart and Mr. Fitzgerald.

15   Let's start with Mr. Fitzgerald.  Who noticed that

16   deposition?

17        MR. BUSTAMANTE:  Initially it was noticed by

18   Attorney Coleman, and she took the deposition.  And

19   thereafter the court reporter service lost it.

20   Electronically, mechanically, whatever way, it's gone.

21        Mr. Fitzgerald also gave deposition testimony in

22   the state court case that at that time was being brought by

23   the Taylor children.  And --

24        MS. BARBER:  That's incorrect.

25        THE COURT:  Okay.  Well, let me hear from

1    plaintiff's counsel on this first, and then I'll give you a

2    chance to respond.

3              Mr. Bustamante, you can go on.  Continue.

4              MR. BUSTAMANTE:  I'm sorry?

5              THE COURT:  You can go on.

6              MR. BUSTAMANTE:  Oh, okay.  So the defense wants us

7    to accept that state testimony instead of us retaking

8    Fitzgerald's deposition.  And frankly there are several

9    differences that we have between state and federal court.

10   No. 1 is the time that is allowed.

11             I'll have to tell the Court I have not yet read the

12   state court deposition.  Mr. Linden has.  There are a number

13   of areas we would like to develop that are not developed in

14   the state court case.  And I think that we can compromise to

15   be limited to a number of hours, we shouldn't have the whole

16   full seven hours, but we should be permitted to take a

17   deposition through, where no fault of our own, the transcript

18   is lost.

19             THE COURT:  Do you know what happened to it?

20             MR. LINDEN:  I spoke to the court reporter, and

21   they sent counsel their statement, the court reporter.  It's

22   the first time it ever happened to them.  It's U.S. Legal

23   Support, and evidently their computer crashed and even their

24   backup crashed.  We tried, we pled with them, and they said

25   it's irretrievable.  So it's really no fault of the defense

10

1    or the plaintiff.  It's never happened before with this

2    pretty large court reporting service.

3              THE COURT:  Did they give you your money back?

4              MR. LINDEN:  They didn't charge us.  At first I got

5    an invoice, it's not right I'm paying for this invoice for

6    Ernst to get it.  Ernst and Fitzgerald were deposed at the

7    same time.  They were able to retrieve Ernst.  And

8    Fitzgerald, through no fault of anybody before the court,

9    it's irretrievable.  It's unfortunate, but that's what

10   happened.

11             MR. BUSTAMANTE:  Actually they did not charge us

12   for Ernst, which was some $800.

13             THE COURT:  Fitzgerald is actually a defendant in

14   the case.

15             MS. BARBER:  Correct.

16             THE COURT:  Do the defendants dispute that this was

17   just a court reporter error?

18             MS. BARBER:  I don't have any reason to disbelieve

19   the court reporter service, that they lost it.  I'm not sure

20   why there wasn't a backup tape.  I don't think I've ever used

21   a court reporter that didn't have a backup tape.  And I'm not

22   sure how that affects their licensing that they lost the

23   deposition.  But I don't have any specific reason to disagree

24   with the problem.

25             THE COURT:  Okay.

1       MS. BARBER:  If your Honor would like me to

2    continue to explain --

3       THE COURT:  You can respond.  I will tell you, it

4    would seem to me to be unfair to not permit a re-deposition

5    under circumstances where the transcript was lost due to no

6    fault of the party taking the deposition.  Especially given

7    that Mr. Fitzgerald is a party.  This is not a third party

8    who otherwise has no interest in the case.  This is somebody

9    who is named as a defendant.

10      You know, in my years practicing I never had a

11   transcript lost.  I never heard of this happening before.  So

12   this strikes me as a once-in-a-blue-moon circumstance, and

13   without any allegation of bad faith here I'm having a hard

14   time seeing why I should deny the right to re-depose

15   Mr. Fitzgerald.

16      MS. BARBER:  The thing is, your Honor, that this

17   would be the third time that plaintiff would be deposing

18   Mr. Fitzgerald.  So he did sit for a deposition twice.

19   Mr. Taylor filed a state court lawsuit and a federal court

20   lawsuit alleging substantially the same things, in particular

21   with regard to Mr. Fitzgerald.

22      So Mr. Fitzgerald is one of the OPR officers who

23   arrested Mr. Taylor for an incident where he was alleged to

24   have shot a BB gun at his neighbor.  Mr. Taylor filed a

25   malicious prosecution case for that charge in state court and

1   deposed Mr. Fitzgerald in that case where he was also a

2   defendant.

3          Mr. Taylor also filed a malicious prosecution case

4   -- malicious prosecution case in this case as well as the

5   various employment claims.  In both cases he alleged that the

6   motivations were racial and politically motivated.

7          So the issues are exactly the same.  So if this was

8   a circumstance where, you know, just this unfortunate event

9   happened, then the situation may be different.  But in this

10  case plaintiff has already deposed Mr. Fitzgerald and asked

11  him all of the questions he wanted to on this topic.

12         THE COURT:  Okay.  But did you object to the

13  federal deposition notice on the merits, raising that

14  argument?

15         MS. BARBER:  No.  He voluntarily sat for the

16  deposition.

17         THE COURT:  So I kind of feel like to some extent

18  the ship has sailed a little bit.  I don't want to say that

19  you've waived the right to object to the deposition notice,

20  because circumstances are a little different, but it seems

21  like the argument you're making on how he had already been

22  deposed in the state case would have been just as properly

23  directed towards the original federal deposition notice.

24         MS. BARBER:  Well, I didn't represent

25  Mr. Fitzgerald at that time so I can't speak specifically

13

1    with respect to that.  But my point in raising that is a

2    fairness aspect.  So your Honor had said that it seems to be

3    unfair for plaintiff to have lost this deposition transcript.

4    And what I'm trying to get across is plaintiff didn't lose

5    everything.  He already has one.  He has one with questions

6    under oath by the counsel that he chose on the topics that he

7    wanted and on the same claims and same issues.

8              THE COURT:  Aren't the parties slightly different,

9    aren't there additional defendants in the one case that --

10   well, aren't there additional defendants here in the federal

11   case --

12             MS. BENSINGER:  Yes.

13             THE COURT:  -- that were not in the state case?

14             MS. BENSINGER:  Yes.  Related to the employment

15   issue.  But the malicious prosecution --

16             THE COURT:  Those are your clients?

17             MS. BENSINGER:  Those are my clients.

18             THE COURT:  So what's to stop your clients from

19   complaining about this deposition transcript from the state

20   court case of Mr. Fitzgerald being used at a trial and

21   potentially, you know, admitted against them given that they

22   weren't there to participate and cross-examine the witness?

23             Because usually, you know, a deposition transcript

24   can be used at a trial against a party if that party was

25   present and had an opportunity to question the witness.  If

1    your clients weren't there it seems like you could argue that

2    the transcript couldn't be used at least as to your clients,

3    or perhaps even heard by the jury in considering your

4    clients' claims.

5            MS. BENSINGER:  Certainly, your Honor.  And we

6    could consider that argument.  But here we have no objection.

7            THE COURT:  Okay.  In any case, the rules are

8    different under state procedure and federal procedure.  The

9    time limit in particular is a big difference.  Is it still

10   three hours under Illinois procedure?

11           MR. BUSTAMANTE:  Correct.

12           MS. BARBER:  And I would just like your Honor to

13   know that the federal court deposition in this case was very

14   short.  I believe it was less than an hour and a half.

15           THE COURT:  Okay.

16           MS. BARBER:  So it seems like a do-over in this

17   circumstance.  He has new counsel, he's going after this guy

18   for a third time --

19           THE COURT:  Well, it's the second time.  I'm really

20   not inclined to hold it against the plaintiff that this

21   transcript from the original federal court deposition is

22   lost.  I think that to the extent there are arguments that

23   could be raised, notwithstanding the fact that he was deposed

24   this intermediate time that we no longer have a record of, I

25   can consider those, but I'm not going to hold it against them

1    that they properly noticed the deposition, the deposition

2    took place without objection on these grounds, and through no

3    fault of their own the transcript is lost.  That strikes me

4    as unfair.

5          I'm going to allow them to re-depose him, because I

6    think that will get around any of the problems about the

7    other deposition being used, but I am going to limit the

8    time, particularly hearing that the federal deposition was

9    originally so short.  This is not going to be an opportunity

10   for plaintiff's counsel to come back and now take a

11   seven-hour deposition.

12         Do you concur with the length?  Do you agree that

13   it was originally only an hour and a half?

14         MR. BUSTAMANTE:  I don't know, your Honor, because

15   the transcript doesn't show when there were pauses --

16         THE COURT:  Were you there?

17         MR. BUSTAMANTE:  No, I was not.

18         MR. LINDEN:  We don't have a transcript.

19         I think you're thinking of the other defendant.

20         MR. BUSTAMANTE:  Oh.

21         MR. LINDEN:  We have no idea.

22         THE COURT:  For the federal case?

23         MR. BUSTAMANTE:  That's correct.

24      (Indecipherable crosstalk.)

25         MR. LINDEN:  We don't know how long because the

16

 1   transcript is not there, so --

 2              THE COURT:  Was it Ms. Coleman who took it?

 3              MR. LINDEN:  Exactly, Judge.

 4              THE COURT:  And you don't know how long she was

 5   there.

 6              MR. LINDEN:  She's a judge now.  But the other dep

 7   she took of Mr. Ernst was quite long, so I don't...

 8              MS. BARBER:  It was not quite long.  And Fitzgerald

 9   was the day after, and it was a lot shorter.  And then

10   Ms. Coleman moved to withdraw the day after that.

11              THE COURT:  Does the court reporting service have a

12   record of how long the deposition was?

13              MR. LINDEN:  We could agree to three hours, Judge,

14   if that would be acceptable.

15              THE COURT:  Because some court reporter put in a

16   time sheet for how long he or she spent at that deposition.

17              MR. LINDEN:  We're agreeable if it would be okay

18   with the Court to limit it to three hours, if that would

19   suffice.

20              THE COURT:  I anticipate there may be an objection.

21   So a limit to three hours?

22              MS. BARBER:  Well, I think two would be more

23   appropriate.

24              But additionally what I'd like to ask is that there

25   are pending motions to dismiss in this case, so Ernst has

1    moved to dismiss all the claims against him, and what I would

2    ask your Honor if he does have to sit again --

3            THE COURT:  But it's Fitzgerald.  You mean

4    Fitzgerald?  You said Ernst.

5            MS. BARBER:  Yes.  I'm sorry.  That's what I meant.

6    If he does have to sit again, if the deposition could be

7    stayed until the motions to dismiss are ruled upon.  So that

8    would at least alleviate some of the burden of having to sit

9    again if he's no longer a defendant.

10           THE COURT:  If he is dismissed as a defendant will

11   he still be a witness?

12           MR. LINDEN:  Most likely he would.  He's part of

13   the OPR investigation that went.  So I don't think -- he

14   would not be a witness.

15           In any event, we did respond, Judge.  It's almost

16   -- it's simply rehash of the prior motion to dismiss.  Your

17   Honor ruled on the great majority of their arguments, we

18   briefed it, but you issued a number of rulings in this case

19   when Ms. Coleman represented the plaintiff.

20           MR. BUSTAMANTE:  He would be a witness.

21           MR. LINDEN:  He would be a witness.

22           THE COURT:  Okay.  I'm not going to stay the

23   deposition.  It seems very likely to me based on what I know

24   of the case that he would be a witness anyway.  I am going to

25   limit it to three hours.

1          I'm also going to make it clear on the record that

2     by choosing to re-depose Mr. Fitzgerald the parties should

3     proceed and the Court will proceed as if that other

4     deposition did not take place.  And I'm specifying that for

5     this reason:  To the extent he said something at that

6     deposition or you think he said something at that deposition

7     that is different than what he says at the new deposition, I

8     don't want Ms. Coleman -- Judge Coleman now -- to be

9     subpoenaed in or anybody else to be subpoenaed in to try to

10    impeach him that he said something different under oath at

11    that other deposition.

12         So to the extent he is going to be re-deposed, this

13    deposition completely supersedes the prior testimony.  That

14    testimony will not be used in any purpose for evidentiary

15    matter.  The only exception for that would be if it comes up

16    in an issue of credibility where Mr. Fitzgerald would need to

17    use that testimony to rebut a claim of recent fabrication.

18    In other words, for somebody to suggest he came up with a new

19    story around the time of this current deposition I would

20    allow him to say I said the same thing previously.  But this

21    is not an opportunity for the plaintiff to try to catch

22    Mr. Fitzgerald in any sort of inconsistent statement.

23         And I'm going to allow it and I'm not going to stay

24    it because I do think he's likely to be a witness here.  I

25    think three hours.  If he sat for a three-hour deposition in

1    the state case and an hour and a half in the federal case,

2    frankly under the seven-hour rule in federal court he's still

3    not very much over what the time limit would be.

4          I appreciate that he's frustrated.  It's never fun

5    to be sued.  Unfortunately one of the things that happens

6    when you get sued is you get deposed.  And under the rules

7    they could have asked him questions for seven hours.  And so

8    I think this is a reasonable compromise for Mr. Fitzgerald.

9          For Sheriff Dart, why does Sheriff Dart need to be

10   deposed in this case?

11         MR. BUSTAMANTE:  I'm sorry, why --

12         THE COURT:  Sheriff Dart.  Why does he need to be

13   deposed?

14         MR. BUSTAMANTE:  Your Honor, there are several

15   reasons.  Let me start first that -- Mr. Taylor states -- has

16   testified, I believe, that Sheriff Dart was present at

17   political functions where Mr. Taylor was supporting or

18   backing Mr. Dart's appointment for sheriff.  Mr. Taylor

19   believes that part of the reason for why he was treated the

20   way he was treated is because of retaliation because of his

21   political support of Dart's opponent.

22         Now, Mr. Taylor has informed me that it has been

23   more than one occasion where he and Dart were at the same

24   function together.  Okay?  I want to question Mr. Dart about

25   those things.  But not only that, your Honor --

20

1     THE COURT:  Does Sheriff Dart know Mr. Taylor?

2     MR. BUSTAMANTE:  Well, Mr. Taylor believes Mr. Dart

3  knows him.  Whether Mr. Dart will acknowledge that or not I

4  don't know.

5     THE COURT:  Does he have a basis -- have they

6  spoken to each other, has he been introduced to Sheriff Dart?

7  I have been at events with lots of people; I wouldn't claim

8  that, you know, because I once saw Prince in concert that

9  Prince knows me -- or knew me when he was alive -- to use an

10  absurd example.

11     MR. BUSTAMANTE:  Your Honor, when you're in a small

12  group of people -- and this was happening at a Fire

13  Department meeting with fire personnel, and Mr. Taylor and

14  Mr. Dart, where Mr. Dart is speaking to a very small group of

15  people, and looking directly at Mr. Taylor, and Mr. Dart in

16  his speech, Mr. Taylor reports, uses profanities, uses this,

17  uses that.

18     So he's well-acquainted with -- this is not an

19  unknown person.  This is like two friends talking together.

20  This is what Mr. Taylor reported to me.

21     THE COURT:  Is there anything in the record to

22  indicate that Sheriff Dart was personally involved in the

23  decisions involving Mr. Taylor's employment?

24     MR. BUSTAMANTE:  Well, therein comes the rub, your

25  Honor.  Mr. Dart has attempted, and probably successfully so

1   far, attempted to distance himself from anything having to do

2   with Mr. Taylor.  And he claims he has no responsibility

3   whatsoever, it appears to me, for how his office is run.  So

4   that's another area I would like to question him, your Honor.

5          For example, when Mr. Taylor was detained and

6   people came to his house and searched it with a warrant, a

7   number of racial expletives were being used by his sheriffs.

8   This was reported by -- one of the sheriffs was reported to

9   the chain of command.

10          Now, if Mr. Dart is the Sheriff of Cook County, why

11  didn't he take action to at least investigate those reports

12  of racial epithets being thrown at his own sheriff,

13  Mr. Taylor.  And --

14          THE COURT:  Do you have evidence that he was aware?

15          MR. LINDEN:  Can I add one thing, Judge?  We do in

16  some respects, about three years ago to this day -- I don't

17  know if your Honor read, it's been all over the paper --

18  Mr. Dart gave an interview on WGN radio what happened at

19  Mr. Dart's disciplinary hearing before the merit board --

20          MR. BUSTAMANTE:  Mr. Taylor's.

21          MR. LINDEN:  Mr. Taylor's disciplinary hearing.  It

22  was found by Judge Cohen in the Circuit Court of Cook County

23  about three years ago that the board is improperly

24  constituted.

25          It has gotten a lot of press.  What happened, one

22

1    of our claims in this case is a retaliation claim that after

2    Officer Taylor was found guilty by the merit board, and then

3    that decision was overturned, that a backpay order is in

4    place.  Mr. Taylor alleges that Sheriff Dart, through him and

5    his undersheriff, Undersheriff Whittler, retaliated against

6    him, tried to reinstate these old complaints just to

7    retaliate.

8                    THE COURT:  Retaliated against him for what?

9                    MR. LINDEN:  Retaliated essentially for asserting

10   his court rights in the Circuit Court of Cook County and

11   getting his termination overturned and ordered backpay.

12                   THE COURT:  Is the undersheriff on a witness list,

13   and has he or she been deposed?

14                   MR. BUSTAMANTE:  She is.  They're still determining

15   whether or not to object to it, according to the footnote.

16   We've requested her deposition.  But opposing counsel has not

17   yet determined whether they will object or not.

18                   MR. LINDEN:  Maybe as a compromise would it make

19   sense if we were able to depose the undersheriff and maybe

20   reserve your Honor's ruling with respect to Sheriff Dart?

21                   MS. BENSINGER:  Can I respond to all of this if you

22   don't --

23                   THE COURT:  I'll ask one easy question, and then

24   you may respond.

25                   MS. BENSINGER:  Okay.

23

1               THE COURT:  Easy question:  Has Mr. Taylor been

2   deposed yet?

3               MS. BARBER:  Yes.

4               MS. BENSINGER:  There were initially three cases --

5   maybe Ms. Barber can speak to this better -- and Mr. Taylor

6   requested that he be deposed early on, even though we hadn't

7   gone through discovery.

8               Is that right?  Or maybe you can talk about what

9   happened.

10              MS. BARBER:  I can't add any -- I'm not sure.  I

11  can't add anything.  We came into the case around the same

12  time.  But he was deposed by previous counsel in the federal

13  case.  But there were a number of federal court cases.  I

14  believe the 2015 case was consolidated with this one after he

15  had been deposed.

16              MS. BENSINGER:  So there may be a request to

17  re-depose him, but at this point he has been deposed.

18              THE COURT:  Was he asked about Sheriff Dart's

19  personal involvement or lack thereof in his whole process in

20  Mr. Taylor's disciplinary process, everything that happened

21  in front of the merit review board, et cetera?

22              MS. BARBER:  Unfortunately I can't remember the

23  date of his deposition, so I'm not sure where we even were in

24  the process with the merit board when he was deposed.  I'm

25  sorry.  I don't have that information.

1          THE COURT:  Okay.

2          MS. BENSINGER:  I haven't seen any evidence that

3   Mr. Taylor has any personal knowledge of the Sheriff's

4   involvement in any personnel or any employment action with

5   regard to him.  I can tell you, your Honor, that the Sheriff

6   has responded -- himself, has responded to plaintiff's

7   interrogatories and has stated under oath that he has had no

8   involvement in the personnel decisions with respect to

9   Mr. Taylor or any employment action with respect to

10  Mr. Taylor.

11          And as you know, there is significant case law

12  recognizing the special circumstances for deposing a public

13  official, particularly one as busy as Sheriff Dart.

14          So the idea that the sheriff has no responsibility

15  for running his office, I'm not even going to sound to that,

16  because if the sheriff were required to sit for a deposition

17  on every individual who says, oh, well, he needs to sit

18  because I filed a lawsuit and I need to find out how involved

19  he was in the office, that's not the standard.

20          THE COURT:  Okay.  So recognizing the incredible

21  number of lawsuits that are filed where people want to sue

22  Sheriff Dart, I think before I would permit the deposition to

23  go forward I would need to have some evidentiary basis to

24  believe that he has personal knowledge of facts that are

25  necessary to decide this case.  So far I haven't heard that a

1    witness said, yes, I discussed with this Sheriff Dart and he

2    knows Mr. Taylor, or whatever it might be.

3        It seems like the only basis the plaintiffs are

4    offering or the plaintiff is offering for believing Sheriff

5    Dart has any personal knowledge is just Mr. Taylor's

6    speculation.  What else does he have, if anything?

7        MR. LINDEN:  He drove -- Sheriff Dart's opponent in

8    the election was a person by the name of Sylvester Baker.  I

9    think it was back in 2010, I believe.  I think it's 2010 I

10   believe at the end.  Mr. Taylor was a driver for Sylvester

11   Baker.  Mr. Taylor, I understand it, appeared in radio

12   commercials for him.

13       So we do believe that there is more than

14   speculation that Sheriff Dart was aware of Officer Taylor.

15   I've heard the Cook County Sheriff's Department is very, very

16   political.  They've got people looking to see who opposes

17   Sheriff Dart.

18       MS. BENSINGER:  Can we not have on the public

19   record speculation and rumors?  I'm going to object to that.

20   Both counsel.

21       THE COURT:  Okay.  I'm not going to strike his

22   comments.  I mean, this is clear this is what the attorney is

23   representing as being his belief.  I don't think it's all

24   that controversial for a citizen of Cook County to suggest

25   that the sheriff's office is political.  He's not a witness.

26

1    He's not under oath.  Once we start saying attorneys can't --

2    have to be very careful about those sorts of statements we

3    probably would get everybody in trouble.

4           I'm still not hearing actual evidence of personal

5    knowledge.  So the jump that you want me to make is that

6    because Mr. Taylor was a driver for the political opponent

7    you think Sheriff Dart knew that he was a driver?  Do you

8    mean driver, or do you mean something more than that?

9           MR. LINDEN:  A driver.  He drove Sylvester Baker to

10   the political events, as I understand it, events where

11   Sheriff Dart was present or may have been present.  I know

12   Officer Taylor appeared in commercials for Sylvester Baker,

13   and it certainly wouldn't be past imagination that Sheriff

14   Dart would have been aware of it or one of his sheriffs.

15          THE COURT:  Well, it might not be past imagination,

16   but that's not evidence again.

17          Do you have a copy of the interrogatory responses

18   from Sheriff Dart?

19          MR. BUSTAMANTE:  Yes, we do -- not with us, but we

20   do have one.

21          THE COURT:  I don't think they were attached to any

22   of the reports.

23          I take it he was asked whether he had any personal

24   involvement in any this, whether he had personal knowledge,

25   is that fair to say?

27

```
1              MS. BENSINGER:  Yes.
2              MR. BUSTAMANTE:  Your Honor, how about this?  I
3      understand --
4              THE COURT:  No, I think --
5              MS. BENSINGER:  I can email you those right now if
6      you would like.
7              THE COURT:  Let me sort of explain where I'm
8      heading with this.
9              MR. BUSTAMANTE:  Okay.
10             THE COURT:  You can do depositions on questions.
11     Depositions don't have to be pursuant to an oral deposition.
12     It's not clear to me that a deposition on written questions
13     would advance the ball beyond what you've already gotten in
14     the interrogatory responses.
15             In order to decide this issue regarding Sheriff
16     Dart, I would like to have submitted a copy of his
17     interrogatory responses.  Now, are they verified by Sheriff
18     Dart himself?
19             MS. BENSINGER:  Yes, your Honor.
20             THE COURT:  Then I'd like to see those.  Is there
21     any other place that you can point in the record -- in the
22     record, so not just what you think based on the fact that you
23     live in Cook County and you know how things work here --
24     where somebody has said or a document shows that Sheriff Dart
25     had any personal involvement with Mr. Taylor?
```

28

1          MR. LINDEN:  He certainly has personal knowledge of

2     Officer Taylor at this point.  I can point to a WGN radio

3     interview, probably find it on some website where -- it's a

4     big issue for the county, it got an awful lot of press.  I

5     was quoted last Monday in an article from the Sun-Times, and

6     so was a spokesman.  This ruling could threaten them due to

7     hundreds of disciplinary cases, because what happened the

8     enabling statute for the sheriff's merit board only allows

9     appointments of six years only.  Sheriff Dart over the years

10    has ignored that rule and made interim appointments, had

11    merit board members whose term, even interim appointments,

12    had long expired.

13          So there has been class actions filed, there is

14    numerous lawsuits, and it's a big issue.  And it's more than

15    speculation at this point.  If Sheriff Dart reads the Sun

16    Times and Tribune, he was interviewed on WGN radio, he's

17    certainly aware at this point of Officer Taylor.

18          THE COURT:  Because of the lawsuit and because of

19    the other lawsuit.

20          MR. LINDEN:  Correct.

21          THE COURT:  And the problem --

22          MR. BUSTAMANTE:  Here's what I would like to say.

23          THE COURT:  -- the problem is this disciplinary

24    proceeding has overlapped with this lawsuit?

25          MR. LINDEN:  Yes, your Honor.

1    MR. BUSTAMANTE:  We'll submit the interrogatories

2  as you requested, and what I'd like to do is if in the

3  future, as we're going through the depositions, we can bring

4  those facts that your Honor requires that will allow us to

5  take Mr. Dart's deposition, would you, your Honor, consider

6  that, would you leave that option open?

7    THE COURT:  Of deposing him?

8    MR. BUSTAMANTE:  Of deposing him, yes.

9    THE COURT:  I will leave the option open if he has

10  personal knowledge of facts that are relevant to the case.

11  And so far I haven't seen that.  So that's what I would need

12  to see.  I would need to know that it's based on something

13  more than just he's the sheriff so he's in charge.  Or if he

14  doesn't know then that's the problem because he's the sheriff

15  and he's in charge.

16    If he actually personally knows Mr. Taylor, if he

17  personally was involved in decisions involving Mr. Taylor,

18  then it would be appropriate to depose him, and it would

19  distinguish this case from the thousands of other cases in

20  which people have tried to sue Sheriff Dart, properly or

21  improperly.  But I don't have enough now to compel the

22  deposition.

23    The second thing I would say is that my first

24  inclination would be to see if it could be a deposition on

25  written questions pursuant to Federal Rule of Civil Procedure

1  31 rather than an oral deposition.  And that would depend on

2  how compelling your evidence is of his personal involvement.

3        Now, if this is a situation where he's very removed

4  and you don't need to question somebody about conversations

5  they had or places they visited, written depositions may be

6  all that's warranted.  I'm not going to take the idea of

7  deposing Sheriff Dart completely off the table, because there

8  are circumstances where he's going to be an appropriate fact

9  witness.  I haven't seen any evidence that this is one of

10  those cases yet.  Okay?

11        So I'm not going to compel the deposition.  The

12  parties can raise this issue again as the record is developed

13  here.

14        MS. BENSINGER:  And your Honor, I think that's a

15  similar issue with Ms. Whittler.  What I'm hearing from the

16  plaintiff is that they believe that Ms. Whittler was involved

17  in the decision to reinstitute merit board charges against

18  plaintiff.  She's the undersheriff.  If they want to issue

19  interrogatories about her involvement, because I don't

20  believe she had any involvement with Percy Taylor whatsoever,

21  other than maybe signing off on command channel review back

22  before the statute of limitations, then I think that would be

23  appropriate.

24        THE COURT:  What was her involvement?

25        MR. LINDEN:  She was undersheriff.  My recollection

1    is that she signed off.  Her name appears on numerous

2    documents regarding discipline for Officer Taylor.  I believe

3    she was involved.  I believe she knows of Officer Taylor.  I

4    think we're getting a step removed from...

5              THE COURT:  Okay.  I'm going to defer any ruling on

6    her specifically.  If she is the person that signed off on

7    paperwork that probably does expose her to having

8    participated in some discovery here.

9              I imagine at some point some official in the

10   sheriff's office of some level of seniority must have signed

11   off on paperwork involving Mr. Taylor.  I don't know who that

12   person is.  But that person should probably expect to be

13   deposed.

14             MS. BENSINGER:  Absolutely, your Honor.  So we're

15   talking about the No. 1 guy and the No. 2 guy -- or woman,

16   the undersheriff.  So there is a command channel review for

17   just, you know, disciplinary proceedings, but that happened

18   well before -- so the undersheriff was one of the -- I think

19   there are three levels of review that signed off on the

20   plaintiff's discipline and investigation from the inspector

21   general, but that occurred before the statute of limitations

22   period.  She can't be sued for that.

23             I believe that their complaint against her is about

24   merit board charges, separate and apart from this OPR command

25   channel review issue, merit board charges that she

1   reinstituted.  If we can demonstrate that she had no

2   involvement in those merit board charges, then I would like

3   to be able to explore that through an interrogatory where she

4   can just say I promise you, you know, I had no involvement.

5              THE COURT:  I'm not sure about the statute of

6   limitations point that you are making.  She might not be able

7   to be charged based on certain time periods, but if there are

8   other charges that relate to that time period she may be a

9   witness relevant to those allegations and therefore could be

10   deposed about those allegations even if she can't be charged.

11             Am I misunderstanding your point?

12             MS. BENSINGER:  No, but just because her name

13   appears on the command channel review doesn't mean that, you

14   know, she -- I don't believe warrants an extended deposition

15   for the undersheriff.  I think that there are special

16   concerns and considerations because she is in the position

17   that she is.  But we can cross that bridge when we get to it,

18   but I just wanted to...

19             THE COURT:  Has there been an interrogatory issued

20   by the plaintiff that asks the defendants to identify people

21   who were involved in the review process?  And perhaps to

22   explain what the review process is step by step.

23             MR. BUSTAMANTE:  I don't know for a fact.  I do

24   know she signed off on a number of documents.  It's our

25   contention even of she gives a blind -- I didn't know better,

1   just signed documents, if you sign a document you're

2   responsible for knowing it and you have a right to question

3   her.  She claims she signed off on documents.  Even if she's

4   going to say under oath that I didn't know, I had no

5   knowledge of it, why did she sign her name to it?  I think we

6   have a right to explore that, even if she's going to say --

7               THE COURT:  Was this something that was discussed

8   at your meet and confer?

9               MS. BENSINGER:  Yes.

10              MR. LINDEN:  We discussed it.  Yes.

11              THE COURT:  It's not highlighted as an issue in the

12  status report.  The status report only mentions Sheriff Dart

13  and Mr. Fitzgerald.

14              MR. LINDEN:  That's because they were considering

15  whether or not to withdraw their objection.  And because we

16  didn't resolve that or because they didn't decide up to

17  today, that's why it's not in the status report.

18              THE COURT:  So the parties should talk about this,

19  because it does seem that some of this information can be

20  better obtained through interrogatories or perhaps written

21  deposition questions.  I appreciate the fact that the person

22  who wants to take the deposition usually isn't thrilled with

23  a written deposition because they're concerned that the

24  witness basically has time to consult with their lawyer and

25  draft answers that are going to be more polished than what

1    they might be at a deposition.  However, the benefit of them

2    is that when you have somebody who has the sort of job

3    responsibilities that an undersheriff has, sometimes you get

4    better answers because they have an opportunity to review

5    their files, to refresh their recollection as to things that

6    they may have forgotten because they deal with so many people

7    in cases, and you may actually get more fulsome answers than

8    what you would get from somebody who is concerned about

9    speaking off-the-cuff at a deposition and being wrong.

10           So I would strongly encourage the parties to

11   consider whether some of these depositions, particularly of

12   more senior people, could be accomplished in writing under

13   Rule 31 or through interrogatories.  To the extent that an

14   official is the person who signed off on an employment

15   action, they are probably going to be subject -- and she's

16   also a defendant for some claims here.  She's going to be --

17   I believe.  You think she won't be after the motion to

18   dismiss, or have I already ruled on that?

19           MS. BENSINGER:  So just -- I think that the only

20   claim that she's in this case for is reinstating some merit

21   board charges against Percy Taylor for which she had no

22   involvement.  So that's -- and I would love it if they could

23   issue us an interrogatory, did you have any involvement in

24   that issue, and we say no, and there we go.

25           THE COURT:  Has a notice of deposition been issued

1  for her?

2  MR. LINDEN:  I believe we did issue a notice, and

3  then we kind of held off, and we did the meet and confer and

4  trying to resolve it, but --

5  MS. BENSINGER:  There was no notice.

6  MR. LINDEN:  I thought we did.  We can give notice

7  tomorrow.  But they objected to it --

8  MR. BUSTAMANTE:  I mean --

9  THE COURT:  Let's speak one at a time.

10  Anybody you want to depose formally notice the

11  deposition so you've made your record, and it will force the

12  other side to actually oppose it in some way.  Once you're at

13  issue, consider whether you can reach a compromise such as a

14  written deposition, and if you can't, come back to me and

15  I'll decide it.  But for her --

16  MR. LINDEN:  Can we have until mid next week to

17  issue all the notices?  We'll get them on file by -- or

18  issued by Monday.

19  THE COURT:  Right now you do have a discovery

20  deadline.  It's clear that's going to need to be adjusted.

21  I'm not suggesting you need to run out and sort of blindly

22  issue deposition notices next week.  I would rather you try

23  to work with each other to come up with a schedule when

24  people can actually show up for a deposition.  If you issue a

25  bunch of deposition notices next week, I'm guessing most of

1    those dates are not going to work for witnesses, and there is

2    really not a lot of point of insisting on dates that you know

3    people can't make.  So I want this to go forward in an

4    orderly manner.

5              Let's talk about the written responses for a

6    minute, because it may be that some of these written response

7    issues need to be dealt with before we get to the depositions

8    or at least some of the depositions.

9              On the interrogatories, for the ones -- well, let

10   me skip to the easier one.  Item 3 in the status report that

11   I received that was filed deals with plaintiff's response to

12   defendants' second production request.  My understanding is

13   plaintiff is saying that you didn't receive that request.

14             MR. BUSTAMANTE:  That's right, your Honor.  We

15   couldn't find it, and it was never brought up at our October

16   6th meeting, so we were oblivious.  But we got it on the

17   19th.  If we can have 14 days to respond to that.

18             MS. BENSINGER:  Your Honor, I emailed it to

19   plaintiff's counsel, the three of them, on August 8th, over

20   two months ago, and followed up with an email on October

21   10th, and indicated that if I didn't hear a response that I

22   was going to have to file a motion to compel.  I didn't hear

23   anything.

24             THE COURT:  Okay.  So I'm going to give them the

25   two weeks, because I don't have a motion to compel in front

1    of me, and it wasn't part of the meet and confer.  So it's

2    not properly in front of me to be considered as a motion to

3    compel.  I'm going to give it until November 7th, so 14 days

4    for the documents to be produced.

5              What sort of documents are included in this

6    supplemental production?

7              MS. BENSINGER:  This is documents on mitigation.

8    It's, you know, a wrongful termination lawsuit.  So what the

9    plaintiff has done in the interim to find alternative

10   employment.

11             THE COURT:  Okay.  And am I understanding correctly

12   that the plaintiff has not -- has declined to answer an

13   interrogatory identifying all of his employment positions in

14   the last 15 years?

15             MR. LINDEN:  No, that's not accurate.  What

16   happened at the meet and confer, my recollection is that

17   issue was never brought up.  We'll get answers to them if we

18   can in 14 days.  But that was stuck in the status report.  I

19   don't believe that was ever discussed, No. 16, and I think we

20   had a meeting for over two hours if I recall.  Maybe counsel

21   has a different recollection.

22             MS. BENSINGER:  This has been raised with opposing

23   counsel previously.  I'm not sure if it was raised at the

24   status.  I would have hoped it would be.  But I've got maybe

25   three or four emails since I came into the case asking for

1    information to be updated, asking for some real, you know,

2    information on their end.  And what we got was, we'll think

3    about updating our interrogatories, we'll think about

4    updating our interrogatories, and then finally at the meet

5    and confer it was we are not updating our interrogatories.

6         So it certainly has been raised in the past.  I

7    don't know if we specifically discussed it at the meeting.

8         MR. BUSTAMANTE:  Your Honor, the interrogatories

9    were initially answered by Attorney Coleman, and she did just

10   simply list his employment as a sheriff's police officer.  We

11   don't disagree that they -- we should update those

12   interrogatories, and we are working to update them to bring

13   them, you know, all the way from his term that he was -- they

14   stopped paying him at the sheriff's police all the way up to

15   today.

16        THE COURT:  So what I'm seeing in this exhibit that

17   was not filed is:  "Identify all employment positions held by

18   plaintiff in the last 15 years.

19        "Cook County Sheriff's office, police officer, 2000

20   to 2013."

21        Is it the defense position that there were other

22   positions during that time period, or that this response is

23   deficient because it doesn't list anything until after 2013?

24        MR. LINDEN:  I think he had a couple part-time

25   minimal jobs doing security.

1           THE COURT:  Since 2013?

2           MR. LINDEN:  After 2013.  I believe it may have

3 been after these interrogatories.  But I'll promise to the

4 Court that within 14 days we'll update it and they'll have a

5 complete answer of any employment positions he took.

6           If that would have been brought up in our discovery

7 conference I think we would have addressed it.  But we have

8 no dispute they're entitled to it.  But as far as I know the

9 answer is accurate at the time.  It should be supplemented.

10           THE COURT:  Plaintiff's response to interrogatory

11 No. 16 will be updated by the same -- what?  November 7th

12 date.

13           The other interrogatories that are cited here, the

14 ones to identify witnesses, people who have knowledge of the

15 facts.  Let's see.  Looking at the response to interrogatory

16 No. 1, I have to say the response to interrogatory No. 1

17 looks more detailed than I was expecting.  So what's the

18 complaint about it?

19           MS. BENSINGER:  Okay.  If you start on page 5, we

20 have probably like 60 or so witnesses from page 5 to page --

21 I think maybe 13 of individuals that plaintiff had a

22 conversation with about the political and racial motivations

23 of Tom Dart and OPR, which is the sheriffs office, IG.

24           So just all of -- that same kind of phrase is

25 continually listed for all of these individuals, and racial

1    or political motivations of the sheriff and OPR, that that

2    was the subject of their conversation.  And that's a problem

3    for us.  You can't just list all of these people, and throw

4    that bomb, and then expect us to defend our case without

5    deposing all of those 70-plus people, or however many it is.

6            THE COURT:  Didn't the defendants have a similarly

7    long list of people?

8            MS. BENSINGER:  No.  We would never say -- we

9    described the issues.  This is a specific interrogatory that

10   says -- that requests anybody who the plaintiff had

11   conversations with about allegations in the complaint and its

12   requests that the plaintiff identify the content of --

13           THE COURT:  How many people do the defendants

14   disclose in their initial disclosures of people potentially

15   having knowledge?

16           MR. LINDEN:  74 or 70 something.

17           MS. BENSINGER:  We've agreed to revise our

18   26(a)(1)s.  We just received their revised 26(a)(1)s.  We

19   don't have an interrogatory response listing 120-plus people

20   that have had a conversation with the plaintiff about the

21   Sheriff of Cook County and the sheriff's, you know, purported

22   racial and political --

23           THE COURT:  Here's the problem.  You've asked an

24   interrogatory that asks them to identify all persons, and yet

25   you seem to be suggesting they have identified too many

41

1    people.

2           MS. BENSINGER:  Not at all.  Not at all.  That's, I

3    think, how they are trying to paint it, but that is

4    fundamentally not our position.

5           So the interrogatory requested the content of the

6    communication.  To set forth what they said.  So what we

7    suggested --

8           THE COURT:  Here's the problem with handling it

9    through the interrogatory.  I'm not sure what else can be

10   done here --

11          MS. BENSINGER:  Yes.

12          THE COURT:  -- because you've asked identify all

13   persons with whom he's had any communication.  And your

14   concern is that he hasn't gotten into enough detail about

15   each and every person --

16          MS. BENSINGER:  I asked to do, you know -- I

17   requested that we come to a compromise, and what I suggested

18   was that the plaintiff identify anybody that -- in those

19   conversations that has identified personal knowledge that

20   that person has about these alleged racial and political

21   motivations of Tom Dart and OPR.  Because it's a lot

22   different if the plaintiff is speaking to these people and

23   listing off the plaintiff's concerns about Tom Dart, or if

24   the other person listed is identifying that that person has

25   personal knowledge.

42

1    THE COURT:  So that's a different interrogatory.

2    That's interrogatory No. 2.  Interrogatory No. 1 is extremely

3    broad, and so I actually think looking at it more information

4    is provided here than I would have expected in response to

5    that interrogatory.  It sounds like your complaint is more

6    with respect to the response to interrogatory No. 2, which

7    asks for the identity of any person who has or claims to have

8    knowledge of the facts concerning the occurrences complained

9    of.

10    MS. BENSINGER:  Potentially, but I still want to

11    just exhaust one issue with interrogatory No. 1.

12    Interrogatory No. 1 also requests that the plaintiff set

13    forth the content of the communication, and instead of

14    requiring the plaintiff to set forth what each person said,

15    all we're asking for to compromise is that they say whether

16    these individuals listed provided any personal knowledge

17    during the conversation.

18    THE COURT:  How is that different than

19    interrogatory No. 2?  Isn't that just a subset of

20    interrogatory No. 2?

21    MS. BENSINGER:  We could make it a subset of

22    interrogatory No. 2, but interrogatory No. 2 doesn't

23    specifically reference this response about purported

24    conversations of racial and political motivations of the

25    sheriff and the IG.

1           MR. LINDEN:  They could have asked Officer Taylor
2   at the deposition, Judge, all this for detail.  Officer
3   Taylor provided the best answers he could, No. 1, and No. 2,
4   they don't ask the context, they just said list it, which he
5   did.

6           It's not the -- the plaintiff shouldn't be faulted
7   for, you know, the defense -- they could have asked all these
8   questions of Officer Taylor.  What did this person know.

9           THE COURT:  Let me ask plaintiff's counsel a
10  question for whichever of you is in a position to answer it.
11  For the people listed in interrogatory No. 2, how were they
12  identified?  Why only those people, out of all of the people
13  listed in interrogatory No. 1?

14          MS. BENSINGER:  They also list interrogatory --

15          THE COURT:  Okay.  I'm sorry.  I'm asking
16  plaintiff's counsel a question.  You'll have a chance to
17  respond.

18          MR. LINDEN:  Judge, Ms. -- now Judge Coleman
19  answered it.  So I'm not in the best position.  But if you
20  look at the question, it's just so vague.  And I would have
21  objected to it, whatever that means:  "Identify any person
22  who has knowledge of the facts concerning the occurrences
23  complained of or were or claimed to have been witnesses to
24  the occurrences complained of."

25          I mean, there's a number of -- it's not a car

44

1    accident case.

2          THE COURT:  Regardless of whether she should have

3    answered it, she did.  Do you know who those people are and

4    what they know?

5          MR. LINDEN:  Yeah, I think these are other people

6    involved in the BB gun.  I can't speak for Ms. Coleman,

7    obviously.

8          THE COURT:  Except for now you're representing the

9    plaintiff, and so you are responsible now for making sure

10   that the discovery responses are complete, and if they need

11   to be supplemented that they're supplemented.

12         MR. LINDEN:  I guess I have a problem trying to

13   answer.  It's so big, your Honor.  What occurrences; maybe

14   they could specify what occurrences.  We could, again, list

15   everybody in one which would be --

16         MS. BENSINGER:  He did list everybody in one.

17         MR. LINDEN:  Right.

18         MS. BENSINGER:  So the answer to No. 2 incorporates

19   everybody that was listed in No. 1.

20         Sorry.  That's what I was trying to get at

21   previously.

22         THE COURT:  Okay.  Today, if the plaintiff were

23   answering interrogatory No. 3:  "Identify each person whom

24   you may call as a witness at trial and the subject matter

25   about which each may testify," how many people would you

1 list?

2     MR. LINDEN: 32.

3     MR. BUSTAMANTE: I believe it was 32. How many

4 would we list? About 32.

5     THE COURT: You would list 32 as potential people

6 to be witnesses at trial.

7     MR. LINDEN: Yes.

8     THE COURT: And are you able to describe what they

9 would testify about?

10     MR. BUSTAMANTE: I believe so, your Honor. We

11 prepared, I don't know if you saw in the report, a

12 supplemental 26(a) disclosure that lists the 32 people that

13 we would likely call at trial. And yes, we would be able to

14 describe what subject areas they're going to be questioned

15 about or on which they will testify.

16     THE COURT: I'm going to direct the plaintiff also

17 by November 7th to provide an updated supplemental answer to

18 interrogatory No. 3 so that it's clear -- I understand you

19 say that you've updated your 26(a) disclosure, but let's make

20 sure that things are consistent and it's clear who the people

21 are that you may call as a witness during trial.

22     If something changes and you discover somebody new

23 that you think has information that warrants putting them on

24 the list, you have an obligation to supplement. So you

25 should supplement it if somebody else comes up. But it

1  sounds like on November 7th it will be a list of 32 people

2  and you will be able to describe the subject matter on which

3  they are going to testify.  Is that true?

4          MR. BUSTAMANTE:  Yes, your Honor.

5          MR. LINDEN:  And I think the defense promised to do

6  the same to us.  We're awaiting their supplemental -- they

7  identified over 70-some-odd witnesses and said that once we

8  limit our witnesses and supplement that they will, and I

9  think it's only fair that they...

10          MS. BENSINGER:  We certainly will be reasonable.

11  Yes.

12          MR. LINDEN:  We haven't seen that much.

13          MS. BENSINGER:  Your Honor, the concern that I

14  have, I think, you know, this is a great option, and I'm

15  really glad that we're working through this, but the research

16  that I found is -- doesn't eliminate these bombs that they've

17  dropped.

18          THE COURT:  I don't know what you mean when you say

19  "bombs that they've dropped."  It sounds like just rhetorical

20  flourish to me.  What specifically are you referring to?

21          MS. BENSINGER:  Okay.  So they list all these

22  witnesses in response to interrogatory 1 and say that these

23  witnesses have had communications with the plaintiff about

24  the purported racial and political motivations of Tom Dart

25  and the IG.  So I -- if that's still out there and these

1    witnesses conceivably have personal knowledge about purported

2    racial motivations and political motivations of my client, I

3    don't want to be in a situation where plaintiff has got sworn

4    answers -- because these were sworn -- saying, you know,

5    defense had notice.

6              Well, yeah, they weren't on our witness list, but

7    you had notice that, you know, Bernard Taylor, or Abraham

8    Smith, or whoever, like, you know, the rest of these people

9    had knowledge of the racial or political motivations of the

10   sheriff and of OPR.

11             So I just don't want to get into a situation

12   where --

13             THE COURT:  If it's not on their list of people

14   they would call as a witness at trial they won't be able to

15   call them at trial.  So I'm not sure what sort of notice

16   you're complaining about.

17             MS. BENSINGER:  Right.  So if it's not on their

18   witness list they won't be able to call them at trial.

19             THE COURT:  I'll be presiding over the trial, so

20   I'll know what you have gone through in trying to narrow the

21   list, and I have asked them to identify people they may call

22   at trial.  I have told them that they need to supplement that

23   list in a timely manner if something new comes up.  If they

24   don't stick to that list and if they don't supplement it in a

25   timely manner, just because somebody's name is somewhere else

1    doesn't mean they're going to get to call that person at

2    trial.

3              MS. BENSINGER:  Okay.  I appreciate that clarity.

4    It should be obvious to me, but this is a problem for me.

5    Because I totally disagree that anybody on this list has

6    personal knowledge of any purported motivations of my client.

7    And I don't like that there are sworn answers that say that

8    they might.

9              THE COURT:  Whether you like it or not, these are

10   the answers.  And if Mr. Taylor told them here's why I think

11   it's racially motivated, that's responsive to your

12   interrogatory.  So if you're unhappy with these answers it's

13   partially because you didn't draft a very good interrogatory,

14   or whoever drafted it drafted -- I should say a very broad

15   interrogatory.  If you want more specific answers, then you

16   should not ask for any person that you had any kind of

17   communication with at all and then complain because you get,

18   quite frankly, again, more information than I think I have

19   ever seen a party give in response to this sort of broad

20   interrogatory.

21             So I think we've talked enough about your concerns

22   about the fact that it says racial motivation.  If what you

23   really want to know is who are the people that Mr. Taylor

24   thinks have their own personal knowledge, not something they

25   heard from him but their own personal knowledge of racial

49

1    motivations, that's a different question, and it's a
2    different question than the one in interrogatory No. 1 quite
3    frankly.  It is more similar to interrogatory No. 2, which is
4    why -- if Mr. Taylor wants to supplement interrogatory No. 1
5    for clarity and avoid certain issues he can certainly do so,
6    but looking at the information provided here, again, it seems
7    that he was responsive.  It's not necessarily the most
8    helpful answer, but it is responsive.

9         It does not seem that there is something here that
10   is not being provided.  There is a little bit of boilerplate
11   here, but frankly, I would not hesitate to let you sit
12   Mr. Taylor down at a deposition and ask him to go through the
13   different people.  List the people.  You could also do that.
14   I don't know that would be a productive use of anybody's
15   time.  But that's usually what happens after you serve an
16   interrogatory and you get a long list of people.

17        I am going to direct plaintiff's counsel to go back
18   to Mr. Taylor and to supplement, to the extent necessary, the
19   response to interrogatory No. 2.  It sounds to me like at
20   this point, because in the change of counsel perhaps, you
21   don't actually know what the basis was for the response in
22   interrogatory No. 2.  You need to know that.  Regardless of
23   whether somebody else represented Mr. Taylor at the time, he
24   verified these responses, is that correct?
25        MS. BENSINGER:  Yes.

1    THE COURT:  I don't have a signed verification page

2    here.

3    MS. BENSINGER:  I believe it was emailed

4    separately.  So I've got that that I can provide to you, your

5    Honor.

6    THE COURT:  Okay.  Are the people who are listed in

7    interrogatory No. 2 the same people who are on the list of 32

8    potential witnesses?

9    MR. BUSTAMANTE:  Let me see, your Honor.

10    THE COURT:  There are 22 people there.

11    MS. BENSINGER:  And it says see interrogatory No. 1

12    at the end of interrogatory No. 2.

13    THE COURT:  So let me be clear.

14    MR. BUSTAMANTE:  If they're not, your Honor, they

15    probably will be.

16    THE COURT:  Okay.  I want supplemented responses to

17    interrogatories No. 2 and 3 that do not incorporate by

18    reference interrogatory No. 1.  Interrogatory No. 1 is

19    extremely broad, it is a long list of people and covers a

20    long list of conversations and communications.  Incorporating

21    it by reference I do not consider to be responsive.  I

22    consider interrogatories 2 and 3 to be narrower in scope than

23    interrogatory No. 1.

24    MR. BUSTAMANTE:  Understood.

25    THE COURT:  Confer with your client and serve

51

1     supplemental responses by November 7th.  Are you going to be

2     able to do that?

3                 MR. BUSTAMANTE:  Yes, your Honor.

4                 THE COURT:  And you're also going to be

5     supplementing -- responding to the supplemental document

6     request by November 7th, correct?

7                 MR. BUSTAMANTE:  Yes.

8                 THE COURT:  Okay.  I'm not at this time going to

9     require a supplement to interrogatory No. 1, because based on

10    what I've heard, what counsel wants is actually the response

11    to interrogatories No. 2 and 3.  When you're saying you want

12    to know who has personal knowledge and you want to know who's

13    going to be a witness at trial, you have asked those

14    interrogatories in 2 and 3.  So if you get a complete

15    response there it should moot whatever concerns you're

16    raising about interrogatory No. 1.

17                Okay.  We talked about interrogatories, we've

18    discussed these two depositions, we've talked about the

19    document request.  The only thing that's left in the status

20    report are the list of 15 people that the parties wish to

21    depose.  There are 15 on plaintiff's list, there are 10 on

22    the defendants' proposed list.  There does not appear to be

23    any overlap here, am I seeing that correctly?  Is there any

24    overlap between the list?

25                MS. BARBER:  I don't think there is overlap, but

52

1   it's my understanding that several of the witnesses that we

2   have listed are witnesses plaintiff would like to depose as

3   well.

4           THE COURT:  Okay.  So we've got a total of 27

5   depositions.  The parties should proceed in scheduling these

6   depositions.  There may be objections to them, such as

7   Sheriff Dart and Undersheriff Whittler.  I want those to be

8   properly teed up, meaning I want there to be a formal notice

9   and an objection served so that it's very clear what the

10  issue is, and I want the parties to actually meet and confer

11  on whether there is an alternative as I discussed earlier.

12          I'm not going to resolve any objections to

13  individual witnesses today.  I think the parties should

14  proceed with trying to schedule witnesses and work out as

15  many of these objections as you can, given what you've heard

16  from me so far.

17          You probably need to get the revised discovery

18  responses anyway to confirm who you actually want to depose.

19  Have the defendants served clear disclosures to who you may

20  call as witnesses at trial and on what subject matter, based

21  on what you know now?

22          MS. BENSINGER:  Well, we just received their list

23  recently, and based on their revised disclosures we will

24  submit revised disclosures.

25          THE COURT:  So given that the plaintiff has the

1    burden of proof here, what I'm going to do is I've already

2    said that Mr. Taylor's -- basically the same disclosure is

3    going to need to be served by November 7th.  I want the

4    defendants to make a comparable disclosure of the witnesses

5    that you currently intend or to have on your may-call list --

6    you don't have to call them -- your current may-call list by

7    November 21st.

8              This is a list that you should already have in mind

9    and be working on, and so you'll have a couple of weeks once

10   you see what the plaintiff has offered to see how that

11   changes things.  And you can adjust your deposition plans

12   accordingly.  But it sounds like what everybody needs here is

13   an idea of what's realistic looking ahead to trial and who

14   you would need.  Whose testimony would you put in in support

15   of a summary judgment motion.  Who would you likely call at

16   trial.

17             If there are witnesses that are significant to both

18   parties and that you both would like to depose, I do not want

19   you to fight over who's going to actually notice that

20   deposition.  Reach a compromise.  I have to admit I'm not

21   terribly optimistic based on what I've seen with how the

22   status report ended up getting prepared that you'll be able

23   to work these issues out, but I'm going to assume that that

24   was an aberration and that everybody working on the case is

25   professional, and courteous, and that it just was a bad

54

1  situation, and that going forward you'll be able to work

2  things out.

3        I am hesitant to set a fact discovery cutoff today.

4  I believe the current date that is still on the calendar is

5  December 29th.  So I think what I'd rather do is let you

6  accomplish what you can accomplish for a little while, set

7  another status date, and then reevaluate how much time you

8  actually need for discovery.  That will give the defendants

9  the comfort of having a ruling on the now pending motions to

10  dismiss before you have to worry about the end of discovery,

11  but again, your clients from what I can tell are going to be

12  witnesses if any portion of this case goes forward, so I'm

13  not inclined to excuse them from any discovery obligations,

14  frankly.

15        Let's find a status date.  I've asked you to

16  exchange your witness list; that will be done by the 21st of

17  November.  I would like to see the parties December 12th at

18  10:30, and hopefully you will have accomplished plenty during

19  that time period.

20        For the things I did rule on today is there any

21  confusion?  Fitzgerald is going to be permitted to be deposed

22  again limited to three hours.  Sheriff Dart I'm not at this

23  point going to permit a deposition.  If you want to pursue

24  it, have that conversation.  I won't make you actually send a

25  notice, because I think we all know that that's not going to

55

1   be productive, but if you want to pursue it, try to talk it

2   out with counsel to see if there is an alternative.  As I

3   said before, I'm going to grant a motion for a protective

4   order unless and until I see some indication that he actually

5   has some personal knowledge to contribute that's relevant.

6   If you have something, I will look for the interrogatories, I

7   do still want to have those provided, so why don't you file

8   them as further support for the status report.  I will take a

9   look at it.  But if you have something else that is in the

10  record you'll need to put something together, or a motion to

11  compel or something that explains what's in the record that

12  shows he has personal knowledge such that he should be hauled

13  into an actual deposition.

14          MS. BENSINGER:  Along with that, your Honor, it may

15  be appropriate since they're going to be filing the amended

16  joint status report that I provided the Court this morning

17  that as an exhibit they attach Sheriff Dart's

18  interrogatories.

19          THE COURT:  Yes.  I think that is a good idea.  So

20  let's -- if the parties are in agreement that the wrong

21  report was inadvertently filed, I would like a corrected or

22  amended report to be filed.  Attach the interrogatory

23  responses as an exhibit.  Also attach as an exhibit the

24  plaintiff's interrogatory responses that were handed up to me

25  today so that's clearly part of the record as well.

1            Okay.  And I will take a look at the amended report
2    to see if there is anything that jumps out at me as an issue,
3    but I'm expecting that you're going to be able to go, you're
4    going to get these supplemental responses, you're going to
5    exchange your witness lists, you're going to start scheduling
6    depositions, and in advance of the status hearing on the 12th
7    you actually will have accomplished a lot and will know how
8    many depositions you really need in this case.  Okay?  Thank
9    you.
10           MR. LINDEN:  Thank you for your time.  We
11   appreciate it.
12           MS. BENSINGER:  Thank you.
13           THE COURT:  We're adjourned.
14       (End of proceedings.)
15               C E R T I F I C A T E
16
17       I certify that the foregoing is a correct transcript
18   from the record of proceedings in the above-entitled case on
19   October 24, 2017.
20
21
22
23   /s/Colette M. Kuemmeth
          Court Reporter
24
25