**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PERCY R. TAYLOR, | ) | |
| | ) | |
| Plaintiff, | ) | No. 13 C 1856 |
| | ) | |
| v. | ) | The Honorable Mary M. Rowland |
| | ) | Judge Presiding |
| | ) | |
| COOK COUNTY SHERIFF'S OFFICE, *et al.,* | ) | The Honorable Jeffrey T. Gilbert |
| | ) | Magistrate Judge |
| Defendants. | ) | |

**TAYLOR'S MEMORANDUM IN OPPOSITION**
**TO THE DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT[1]**

Richard F. Linden
312/590-0211
lindenlaw@gmail.com

Peter V. Bustamante
312/346-2072
pvbust@bustamantelaw.com

Linden & Bustamante
17 North State Street, Suite 1550
Chicago, Illinois 60602

---

[1] In this combined response Defendants Dart, Whittler, Ways and the Sheriff's Office are referred to as the "Dart Defendants." Defendants Ernst, Fitzgerald and Estate of Murphy are referred to as the "Ernst Defendants."

## TABLE OF CONTENTS

*I. INTRODUCTION – FACTUAL STATEMENT* ..................................................................1

*II. TITLE VII RACE DISCRIMINATION CLAIMS* ..........................................................4

42 U.S.C. § 2000e ...............................................................................................................4

*Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012) ..................................................4

*A. THE CAT'S PAW THEORY OF LIABILITY PRECLUDES SUMMARY JUDGMENT* .....4

*Robinson v. Perales*, 894 F.3d 818, 832 (7th Cir. 2018) ...................................................4

*Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013)............................................5

*Staub v. Proctor Hospital*, 562 U.S. 411, 131 S.Ct. 1186, 1194 (2011)...........................5

*Sun v. Bd. of Trs. of Univ. of IL,* 473 F.3d 799, 813 (7th Cir. 2007) ................................5

*Maarouf v. Walker Mfg. Co*, 210 F.3d 750, 754 (7th Cir. 2000) ......................................5

*Gusman v. Unisys Corp.*, 986 F.2d 1146, 1147 (7th Cir. 1993) .......................................5

*Mateu-Anderegg v. Sch. Dist. of Whitefish Bay*, 304 F.3d 618 (7th Cir. 2002)...............5

*Defendants Ernst and Fitzgerald (and others) Harbored Discriminatory Animus against Percy* ......................................................................................................5

*The Biased Subordinates' Scheme was a Proximate Cause of the Adverse Employment Actions* .........................................................................................................7

*Wallace v. SMC Pneumatics, Inc.,* 103 F.3d at 1394 1400 (7th Cir. 1997)......................8

*III. FIRST AMENDMENT CLAIMS – POLITICAL ASSOCIATION* ....................................9

*Daza v. Indiana*, 941 F.3d 303, 308 (7th Cir. 2019)........................................................9

*Plaintiff's Conduct is Constitutionally Protected* ...........................................................9

*Branti v. Finkel*, 445 U.S. 507 (1980)..............................................................................9

*Hagan v. Quinn*, 867 F.3d 816, 824 (7th Cir. 2017).........................................................9

*Greene v. Cook County Sheriff's Office*, 79 F.Supp.3d 790, 807-08 (N.D. Ill. 2015)....................9

*Hermes v. Hein*, 742 F.2d 350, 354 n. 3 (7th Cir. 1984) ........................................................9

*Marshall v. Allen*, 984 F.2d 787, 799 (7th Cir. 1993)..........................................................10

*Wainscott v. Henry*, 315 F.3d 844, 849 (7th Cir. 2003)......................................................10

**Genuine Issues of Fact Exist as to whether the Protected Conduct was a Motivating Factor**..10

*Green*, 79 F.Supp.3d at 809 ..................................................................................................10

*Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012) ..................................................10

*Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994).....................................10

*Long v. Teachers' Retirement Sys. of Ill.*, 585 F.3d 344, 350 (7th Cir. 2009)......................10

*Hernandez v. Cook County Sheriff's Office*, 2017 WL 4535982, *8 (N.D. Ill. 9/25/17) ........10

FRE 404(b)..............................................................................................................................12

*Hill v. City of Chicago*, 2011 WL 3840336 (N.D.Ill.) ..........................................................12

*Hartzol v. McDonald's Corp.*, 437 F.Supp.2d 805, 808 (N.D.Ill. 2006) ...............................12

FRE 403 ..................................................................................................................................12

*Okai v. Verfuth*, 275 F.3d 606, 610 (7th Cir. 2001) ............................................................12

*Lanigan v. Babusch*, 2011 WL 5118301, at *2 (N.D.Ill.)....................................................12

*Atanus v. Perry*, 520 F.3d 662, 675 (7th Cir. 2008) ...........................................................13

*Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013) ...................................13

*Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000).........................................................13

*Swetlik v. Crawford*, 738 F.3d 818, 825 n.2 (7th Cir. 2013)................................................14

*Hernandez*, 2017 WL 4535982, at *8 ...................................................................................14

*Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012)..............................................14

*Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993)........................14

**IV. _PERSONAL INVOLVEMENT_** ...............................................................................14

9/30/18 Memorandum Opinion, p. 5, Doc. # 290 .......................................................................15

*Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) ................................................15

*Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1991)...........................................................15

*Greene*, 79 F.Supp.3d at 811-12 .............................................................................................15

*Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009)............................15

*Greene*, 79 F.Supp.3d at 811 ..................................................................................................15

***Undersheriff Zelda Whittler*** ..................................................................................................15

***Sheriff Thomas Dart*** ...........................................................................................................17

***OPR Executive Director Joseph Ways*** ...................................................................................18

***Gregory Ernst and Patrick Fitzgerald*** ...................................................................................18

***Patrick Murphy*** ..................................................................................................................19

***V. DEFENDANTS' PROBABLE CAUSE ARGUMENT IS WITHOUT MERIT*** ...................19

9/30/18 Opinion, p. 9, Doc. 290............................................................................................19

*Mucha v. Village of Oak Brook*, 650 F.3d 1053, 1057 (7th Cir. 2011) ...................................19

*Moore v. Marketplace Rest., Inc.*, 754 F.2d 1336, 1348 (7th Cir. 1985).................................19, 20

*Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1983)................................................20

*Chelios v. Heavener*, 520 F.3d 678, 685-86 (7th Cir. 2008)....................................................21

*Thurman v. Vill. of Hazel Crest*, 570 F.Supp. 1019, 1027 (N.D. Ill. 2008)..................................21

***VI. DART DEFENDANTS FAIL TO SATISFY THEIR INITIAL BURDEN FOR
ARGUMENTS G THROUGH K*** ..................................................................................21

*APS Sports Collectibles, Inc. v. Sports Time, Inc.,* 299 F.3d 624, 631 (7th Cir. 2002) ..................22

*EEOC v. MTC Gear Corp.*, 595 F.Supp. 712, 716 (N.D. Ill. 1984) ...............................................22

*Hanover Ins. Co. v. N. Bldg., Co.*, 891 F.Supp.2d 1019, 1025 (N.D. Ill. 2012)............................22

*Gerhartz v. Richert*, 779 F.3d 682, 686, n. 8 (7th Cir. 2015) ......................................................22

**VII. § 1983 CONSPIRACY** ....................................................................................22

**VIII. STATUTE OF LIMITATIONS** ........................................................................22

9/30/18 Opinion, pp. 14-15, Doc. # 290 ....................................................................23

*Taylor v. City of Chicago*, 80 F.Supp.3d 817, 824 (N.D. Ill. 2015) .............................23

*Lawshe v. Simpson*, 16 F.3d 1475, 1478 (7th Cir. 1994) ............................................23

*CBS Outdoor, Inc. v. Village of Plainfield*, 959 F.Supp.2d 1054, 1062 (N.D. Ill. 2013) .............24

*United States v. Norwood*, 602 F.3d 830, 837 (7th Cir. 2010) ........................................24

*Hileman v. Maze*, 367 F.3d 694, 697 (7th Cir. 2004) ................................................24

**IX. DEFENDANTS' QUALIFIED IMMUNITY ARGUMENT IS NOT WELL-TAKEN** .......24

**Ernst Defendants' Qualified Immunity Argument** ....................................................24

*Saucier v. Katz,* 533 U.S. 194, 201 (2001) ............................................................24

*Moore v. Marketplace Rest., Inc.*, 754 F.2d 1336, 1348 (7th Cir. 1985) ...........................25

*Chelios v. Heavener*, 520 F.3d 678 (7th Cir. 2008) ..................................................25

*Thurman v. Village of Hazel Crest*, 570 F.Supp. 1019 (N.D. Ill. 2008) ............................25

*Thurman*, 570 F.Supp.2d at 1028 ........................................................................26

**Dart Defendants' Qualified Immunity Argument** ....................................................26

*Hernandez v. Sheahan*, 711 F.3d 816 (7th Cir. 2011) ..........................................26, 27

**X. OTHER ARGUMENTS/ASSERTIONS BY DEFENDANTS** ..............................................27

**False and/or Misleading Statements about Circuit Court Backpay Litigation** .........................27

*Goral v. Dart*, 132 N.E.3d 368 (Table) (Ill. 2019) ..................................................27

*Taylor v. Dart*, 77 N.E.3d 86 (Table) (Ill. 1/25/17) ................................................28

*Taylor v. Dart*, 89 N.E.3d 764 (Table) (Ill. 9/27/17) ................................................28

***The Defendants' Improperly Rely on a Void MB Decision and a Circuit Court Decision that was Withdrawn and is of No Effect*** ........................................................................................28

*Taylor v. Dart*, 2017 IL App (1st) 143684-B, ¶¶ 55-56 ..........................................................28

***Defendants Misstate Brown v. County of Cook, 661 F.3d 333 (7th Cir. 2011) for Percy's First Amendment Claims*** ............................................................................................................28

*Brown v. Cty. of Cook*, 661 F.3d 333 (7th Cir. 2011) ..............................................................28

***Defendants were Aware of Percy's Complaints in this Case at the time the MB Complaint was filed about the Guerrero Incident*** .........................................................29

***Malicious Prosecution*** ......................................................................................................29

*Swick v. Liautaud*, 169 Ill.2d 504, 512 (1996) ......................................................................30

***Cook County's Motion for Summary Judgment Must be Denied*** .....................................30

## I. *INTRODUCTION – FACTUAL STATEMENT*

On March 9, 2011, Crystal Taylor, her niece, and her children, arrive home at 10:30 p.m. (Plaintiff's Statement of Additional Facts ("PS") ¶ 7). Crystal parks her car across the street from her house. (*Id.*). She is confronted by two white men, guns drawn, shouting "Put your fucking hands up." (*Id.*). Crystal is scared. Her four children in the back of the SUV are screaming and crying (*Id.*). One of the men, later identified as Fitzgerald, points his gun at Crystal (*Id.*). One of the men opens the car door and points the gun at the kids. (PS ¶ 8). Crystal says, "Please don't shoot." (*Id.*). She is afraid she and her children will be killed. Fitzgerald blocks Crystal's car and she is ordered to turn off the engine. (*Id.*). Crystal and the children are not allowed to get out of the car. (*Id.*). Crystal asks if she can turn the car on for heat. (PS ¶ 10). She is told, "Turn the fucking car off." (*Id.*). A relative approaches with blankets. (*Id.*). The relative is turned away, the blankets are not allowed. (*Id.*). Crystal asks to let the children out to use the bathroom. (*Id.*). She is refused. (*Id.*). Her daughter soils her clothes. (*Id.*). Crystal and her children are finally allowed to get out of the car and into their home at 1:00 a.m. (*Id.*). Half hour later, Crystal is taken to the station and questioned for 3 hours. She returns home at 4:00 a.m. (PS ¶ 10).

These are the acts of investigators from the Office of Professional Review ("OPR") of the Cook County Sheriff's Office ("CCSO"). They were assigned to investigate Crystal's husband Percy Taylor ("Percy" or "Taylor"), a 16-year veteran Cook County Sheriff's Police Officer. (PS ¶ 77).

The CCSO's case against Percy is a three-dollar bill. It started with a claim by Woolfolk that Percy shot a BB-gun at a truck causing property damage. (PS ¶ 23). Woolfolk had a long criminal record. (PS ¶ 36). Woolfolk was angry at Percy because Percy caught him stealing cable television and stealing a drain-cleaning cable. (*Id.*). The OPR investigators never ascertained whether Woolfolk's claim was physically possible. (PS ¶¶ 19, 25, 34, 35). They never investigated

Woolfolk's criminal background. (PS ¶¶ 29, 36). Instead, the OPR investigators used a slew of racial slurs against Percy and his wife, focused on whether Percy, a black man, was on food stamps, whether Percy had outstanding traffic tickets, and combed his personnel file for anything they could use to hurt Percy. (PS ¶¶ 1-5). They obtained a search warrant, in part on a false statement, but found nothing. (PS ¶¶ 14, 1). Not satisfied with trying to hurt Percy, the OPR investigators intentionally terrorized Percy's wife and children. (PS ¶¶ 7-11).

The Ernst Defendants did not just conduct a shoddy investigation. (PS ¶ 19). Their motivation was racial and political animus. (PS ¶¶ 1-6). According to Avet, Ernst and Fitzgerald stated that Percy "lived like a nigger." (PS ¶1). They called Percy a "porch monkey." (*Id.*). They called Percy's wife a "go-o-rilla." (PS ¶ 5). They made jokes and references to Percy's race using the word "nigger." (PS ¶ 1). Fitzgerald and other OPR investigators terrorized Percy's wife. (PS ¶¶ 7-11). OPR, most likely Ernst, sent Percy a taunting memo, three days after the alleged incident, and more than a month before the investigation was completed, stating that the charges against Percy had been **SUSTAINED**. (PS ¶ 21). Ernst made a false statement under oath in the complaint for the search warrant. (PS ¶ 14). Ernst used the N-word 2 to 5 times at Taylor's residence and at OPR headquarters. (PS ¶ 2). At OPR headquarters, Ernst, upset that they could not find a weapon, stated "we're [going] to get this nigger." (*Id.*). At the Merit Board on February 27, 2013, Ernst stated to Percy: "You better quit, nigger." (PS ¶ 3). The Ernst Defendants' acts were intentional and carried out with deliberation, in order to harm Percy.

The claim by Woolfolk was that Percy allegedly shot at the truck 9 times with a BB-gun. (PS ¶ 23). Woolfolk stated that the noise the BB-gun made was a "poof." (*Id.*). The Cook County Sheriff's Police Department ("CCSPD") criminalistics investigation shows only 4 possible pellet strikes on the windshield. (PS ¶ 25). It shows 5 possible gunshot strikes. (*Id.*). No one really knows

2

when any of this damage was done. No one tried to determine the angle of the shots. (PS ¶ 19). No one tried to locate the projectiles. (*Id.*). One of the projectiles penetrated to the motor, another struck the inside wheel cover. (PS ¶ 25). There is no way that a BB-pellet could have penetrated to the motor. The truck was towed away before any search for projectiles was done at the scene. (Johnson Report p. 15). No projectiles were found at the scene or in the truck. (PS ¶ 1). This exculpatory evidence is not included in the summary of the investigation. (PS ¶ 53). The summary is what the higher-ups review. (*Id.*).

The OPR investigation did not meet minimum standards, did not explore exculpatory evidence and was conducted in a racially biased manner. (PS ¶ 51-53). As discussed below, the facts show that the Dart Defendants had Percy fired because of (1) Percy's support of Dart's political opponent; (2) racial discrimination, and (3) because Percy filed racial and political discrimination claims. The Ernst Defendants violated Percy's constitutionally protected rights by false arrest, unlawful detention, intentionally conducting a shoddy investigation, excluding exculpatory evidence, and making false statements. The Ernst Defendants acted either based on racial animus, political animus, or a combination of both.

The acts of retaliation against Percy continued. Before the void Cook County Sheriff's Merit Board ("MB") hearing took place, Defendants sought to fire Percy for allegedly grabbing a Deputy Sheriff's hand to stop an illegal search. (PS ¶ 56). More than a month after that incident, Ernst and Fitzgerald prepared, and had two Deputies sign, misdemeanor criminal complaints against Percy (*Id*., ¶¶ 60-62). Defendants also sought to fire Percy for allegedly telling a sergeant that he was going to write him traffic tickets and lock him up. (PS ¶ 66). The OPR investigations resulted in complaints before the MB seeking Percy's termination. (PS ¶¶ 33, 65, 66). Other CCSO employees with far more serious charges received 3 to 30-day suspensions. (PS ¶ 75). The CCSO

repeatedly moved to dismiss and reinstate these MB cases after Percy prevailed in State Court and the Illinois Appellate Court (PS ¶ 68-72). Further, after the MB decision terminating Percy was declared void, the CCSO refused, and continues to refuse, to put Percy on the payroll and to pay him the backpay and other benefits to which he is entitled (PS ¶ 44-47).

## II. *TITLE VII RACE DISCRIMINATION CLAIMS*

Under Title VII, it is unlawful for an employer to discharge an employee because of race or sex. 42 U.S.C. § 2000e; *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). A plaintiff may prove discrimination directly or indirectly. *Coleman*, 667 F.3d at 845. Under the "direct method," the plaintiff avoids summary judgment by presenting evidence, direct or circumstantial, that the employer's discriminatory animus motivated the adverse employment action. *Id*.

### A. *THE CAT'S PAW THEORY OF LIABILITY PRECLUDES SUMMARY JUDGMENT*

Summary judgment must be denied based on the overt racial prejudice of OPR investigators Ernst and Fitzgerald. The CCSO tries to distance itself from the racial animus of these OPR investigators in an attempt to avoid responsibility for the hideous racial slurs, bias, and slipshod investigation that led to Percy's discharge. It is no defense that Ernst and Fitzgerald were not "decision makers." They set in motion a runaway train that led to Whittler's approval of Ernst's "Report of Investigation," sustaining the charges, approving the recommendation of termination, and filing the MB complaint seeking discharge.

Under the Cat's Paw theory, the CCSO is liable for Ernst and Fitzgerald's racial animus regardless of whether they "technically" made the final disciplinary decisions. The "Cat's Paw" theory "applies when a biased subordinate, who lacks decision-making power, uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Robinson v. Perales*, 894 F.3d 818, 832 (7th Cir. 2018). The plaintiff must provide evidence that (1) the biased subordinate actually harbored discriminatory animus against the plaintiff, and (2)

that the biased subordinate's scheme was a proximate cause of the discharge. *Robinson*, 894 F.3d at 832, *quoting Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013); *see also*, *Staub v. Proctor Hospital*, 562 U.S. 411, 131 S.Ct. 1186, 1194 (2011) (employer may be liable for discrimination if a non-decision maker "performs an act motivated by animus that is intended ... to cause an adverse employment action, and ... that act is a proximate cause of the ultimate employment action.").

Discriminatory statements by the subordinate "may be probative of intentional discrimination if that individual exercised a significant degree of influence over the contested decision." *Sun v. Bd. of Trs. of Univ. of IL,* 473 F.3d 799, 813 (7th Cir. 2007). For example, a subordinate conceals relevant information from the decision maker, thus manipulates the decision making process and influences the decision. *Maarouf v. Walker Mfg. Co*, 210 F.3d 750, 754 (7th Cir. 2000); *Gusman v. Unisys Corp.*, 986 F.2d 1146, 1147 (7th Cir. 1993). In *Mateu-Anderegg v. Sch. Dist. of Whitefish Bay*, 304 F.3d 618 (7th Cir. 2002), the Seventh Circuit stated:

> Thus, "[s]ummary judgment is generally improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action." *Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1459 (7th Cir.1994). For instance, when a biased employee makes a discriminatory statement in the context of a plaintiff's performance review—an evaluation that may be passed along to the decisionmaker—the subordinate's attitudes become relevant to the discrimination calculus. *See, e.g., Eiland v. Trinity Hosp.,* 150 F.3d 747, 751 (7th Cir.1998). More to the point, if the plaintiff proffers evidence demonstrating that the biased non-decisionmaker concealed "relevant information from the decision making employee or feed[s] false information to him," then the animus of the non-decisionmaker becomes relevant because he "is able to influence the [employment decision.]" *Wallace,* 103 F.3d at 1400. Essentially, then, "these cases prevent an employer from escaping liability by setting up many layers of pro forma review, thus making the operative decision that of a subordinate with an illicit motive."

*Mateu-Anderegg*, 304 F.3d at 627.

**Defendants Ernst and Fitzgerald (and others) Harbored Discriminatory Animus against Percy**

There is massive amount of evidence that Ernst and Fitzgerald, the OPR investigators assigned to the case, harbored discriminatory and racial animus towards Percy. George Avet ("Avet"), one of the OPR investigators assigned to the Taylor case, provided damning testimony about the racial animus and racial slurs directed at Percy and his wife Crystal. (PS ¶¶ 1-11).

During the search of Percy's residence, Ernst, Fitzgerald, and others, who were all white, "stated that [Percy] lived like a nigger and called him a porch monkey." (PS ¶1). At the Taylor residence and at OPR headquarters, Ernst used the N-word to refer to Percy (PS ¶ 2). Upset that they could not find a weapon, Ernst stated "we're [going] to get this nigger." (*Id*.). Ernst used the N-word 2-5 times at Percy's residence and both Ernst and Fitzgerald referred to Percy as a "Porch Monkey." (PS ¶¶ 2-3). Fitzgerald also called Percy a "nigger" (PS ¶ 2). On February 27, 2013, at the MB office, Ernst said to Percy: "You better quit, nigger." (PS ¶ 3). Fitzgerald and other OPR investigators terrorized Crystal and their children (*See*, Introduction, above).

On March 9, 2011, Ernst told Percy he was under arrest and Fitzgerald handcuffed him (PS ¶ 15). Percy was left outside in the cold and rain for 30-45 minutes before he was placed in a car (*Id*.). He was taken to OPR in handcuffs and paraded in front of his peers (PS ¶ 16). Ernst handcuffed him to a table (*Id*.). Percy was held for 30 hours (*Id*.). This is all further evidence of racial bias.

Correctional Officer David Evans, an African American, testified about racist photos posted on Fitzgerald's Facebook Page (PS ¶ 4). In 2011 or 2012, Fitzgerald "had a picture of an African American black doll with big, red lips hanging from a noose, from a damn roof, and he had a police baton with the motion that he was hitting… the doll." (*Id*.). Evans describes another incident around 2010 at Cook County Jail. Fitzgerald opened cartons of milk, poured them into

mop buckets in front of the African American detainees for whom the milk was intended, and stated: "Black mother fuckers ain't getting shit." (*Id*.).

Taylor's police practices expert, a retired State Police Lt. Colonel, states in his Report: "Such overt and extreme bias as depicted in Avet's, Hemphill's and Crystal Taylor's testimony, if accurate, demonstrates that OPR investigators involved displayed a racial bias, a bias towards Percy Taylor, political bias and a lack of professionalism." These acts are "contrary to accepted law enforcement practices, standards and training." (PS ¶ 49).

### *The Biased Subordinates' Scheme was a Proximate Cause of the Adverse Employment Actions*

There is substantial evidence that the biased subordinate scheme was a proximate cause of adverse employment actions against Percy. Ernst and Fitzgerald were the OPR investigators assigned to the case under the direction of Ed Dyner and Patrick Murphy (PS ¶12). Ernst and Fitzgerald provided factual information and other input that affected the adverse employment actions. Ernst's role and involvement, as senior and lead investigator, cannot be overstated. (*Id*.). Ernst signed a sworn complaint for the search warrant; searched Taylor's residence, interviewed witnesses; testified for the Sheriff at the *Loudermill* hearing; prepared a prosecution memo for the State's Attorney; prepared and signed OPR's Summary Report ("SR") sustaining the charges and recommending separation; and testified for Sheriff Dart at the MB hearing (PS ¶ 13).

OPR's SR prepared by Ernst is, by itself, sufficient evidence of causation to defeat summary judgment. The SR fails to mention exculpatory evidence including: (1) that no weapon was found; (2) no projectiles were found; (3) the prior animosity that Woolfolk had against Percy (PS ¶ 53); (4) Woolfolk's extensive criminal record; (5) the items listed in Chief Holbrook's April 14, 2011 memo highlighting the problems with the investigation and the weakness of the evidence

(PS ¶ 29, 36, 53); (6) that the case was "he said, she said" with no physical evidence to corroborate Woolfolk's account of what happened. (PS ¶¶ 19, 25, 29, 34, 35).

If the plaintiff proffers evidence demonstrating that the biased non-decisionmaker concealed "relevant information from the decision making employee or feed[s] false information to him," then the animus of the non-decisionmaker becomes relevant because he "is able to influence the [employment decision.]" *Wallace v. SMC Pneumatics, Inc.,* 103 F.3d at 1394 1400 (7th Cir. 1997). Ernst concealed relevant information from the decision makers by omitting key details in his SR.

SRs are provided to give the reader a synopsis of the investigation knowing that busy administrators may only read, and base their decisions on, the SR (PS ¶ 53). This is especially significant in this case where the investigation file is over 300-pages and one of the decision makers, Whittler, testified that she deals "with thousand—thousands of cases." (PS ¶¶ 32, 53). Whittler also admitted that she was not certain if she ever disagreed with an OPR recommendation for discipline (*Id.*). Johnson called Whittler's admission "mind boggling." (PS ¶ 32).

The Command Channel Review ("CCR") process was flawed and failed to result in an unbiased, fair and competent independent review of OPR's investigation (PS ¶ 48). Johnson chronicles many of the deficiencies in the CCR process. Johnson states that the CCR should have resulted in the investigation being classified as Unfounded or Not-Sustained or sent back to OPR for further investigation (PS ¶ 54). The OPR supervisory personnel responsible for ensuring a thorough, complete, objective and impartial investigation failed to comply with accepted law enforcement practices and standards (PS, ¶ 48).

The CCR in Taylor's case was a sham and Ernst's findings and recommendations were rubber-stamped. Before the investigation was completed, the CCSO had decided that charges were

sustained against Percy as evidenced by the March 11, 2011 CCSO memo that states the charges "have been **SUSTAINED**." (PS ¶ 21). Whittler did not sign off on the CCR until April 28, 2011 (*Id.*). OPR's Memorandum of Investigation under the subject "Prosecution Memorandum" dated March 18, 2011, prepared by Ernst also shows that OPR had prejudged the case (*Id.*).

"Proximate cause requires only some direct relation between the injury asserted and the injurious conduct alleged, and excludes those links that are too remote, purely contingent, or indirect." *Staub v. Proctor Hosp.*, 562 U.S. 411, 419-20 (2011). Based on the facts discussed above, a reasonable jury could find that Ernst and Fitzgerald influenced the adverse employment actions against Percy. There are genuine issues of material fact on Taylor's Title VII racial discrimination claims against the CCSO and summary judgment must be denied.

### III. *FIRST AMENDMENT CLAIMS – POLITICAL ASSOCIATION*

To make a *prima facie* case of First Amendment political *discrimination*, plaintiff must show: (1) the plaintiff's conduct is constitutionally protected; and (2) the protected conduct was a motivating factor in the employer's actions. *Daza v. Indiana*, 941 F.3d 303, 308 (7th Cir. 2019).

#### *Plaintiff's Conduct is Constitutionally Protected*

Percy's political support of Baker, Dart's opponent for County Sheriff, is protected under the First Amendment. *Branti v. Finkel*, 445 U.S. 507 (1980) (government employers prohibited from dismissing most public employees on the basis of partisan affiliation); *Hagan v. Quinn*, 867 F.3d 816, 824 (7th Cir. 2017). "'It is undisputed that political nonaffiliation is a right protected under the first amendment.'" *Greene v. Cook County Sheriff's Office*, 79 F.Supp.3d 790, 807-08 (N.D. Ill. 2015), *quoting Hermes v. Hein*, 742 F.2d 350, 354 n. 3 (7th Cir. 1984).

There is no basis for the Dart Defendants' argument that Percy does not have a First Amendment claim (Dart MSJ, p. 11). A lawsuit challenging termination and other adverse employment actions taken against him for supporting a political rival of a public official involves

a matter of public concern. The First Amendment protects the right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends. *Marshall v. Allen*, 984 F.2d 787, 799 (7th Cir. 1993). Speech is directed at a matter of "public concern" if it relates to any matter of political, social, or other community concerns. *Wainscott v. Henry*, 315 F.3d 844, 849 (7th Cir. 2003). Elections of public officials are matters of public concern.

### Genuine Issues of Fact Exist as to whether the Protected Conduct was a Motivating Factor

At this stage, Percy is not required to show but-for causation. *Green*, 79 F.Supp.3d at 809. To survive summary judgment, he only need establish that political considerations were a motivating factor. *Id.*; *see Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012) (to establish a *prima facie* case, the plaintiff must produce evidence that his speech was at least a motivating factor). The "cat's paw" theory of causation applies to the issue of causation against the CCSO over Percy's protected speech. *Greene*, 79 F.Supp.3d at 812.

A motivating factor may be proved by direct or circumstantial evidence. *Kidwell*, 679 F.3d at 965. A plaintiff may rely on circumstantial evidence to establish the employer's awareness of protected expression. *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994). Circumstantial evidence may include suspicious timing, ambiguous oral or written statements, or behavior towards, or comments directed at, other employees in the protected group. *Long v. Teachers' Retirement Sys. of Ill.*, 585 F.3d 344, 350 (7th Cir. 2009); *Greene*, 79 F.Supp.3d at 811. At summary judgment stage, a plaintiff need not prove that the employer was aware but is only required to produce evidence that would permit such an inference. *Dey*, 28 F.3d at 1458. It suffices to show that Percy's political affiliation was a "sufficient condition" for the CCSO's investigation and discipline. *Hernandez v. Cook County Sheriff's Office*, 2017 WL 4535982, *8 (N.D. Ill. 9/25/17).

10

Defendants are wrong that "there is no evidence the [Dart] Defendants were aware of Plaintiff's political support of Baker when [Percy] was terminated." (Dart MSJ, pp. 13-14). Percy's support for Baker was well known and common knowledge (PS ¶¶ 37-39). Percy was identified by name when he spoke for Baker in a radio commercial broadcasted on African American stations during the 2010 campaign (PS ¶ 38). At his deposition, Percy identified seventy-five CCSO employees with whom he had talked about his support for Baker (PS ¶ 37).

Percy was a driver for Baker, taking him to meetings, slatings and "tons of political events." (*Id.*). Percy openly campaigned for Baker passing out literature in front of Cook County Jail with Baker's campaign signs on Baker's truck (PS ¶ 39). Fitzgerald was aware of Percy's support for Baker because Fitzgerald was a Union Rep. Evans and Percy tried to arrange a meeting to request the Union's endorsement (PS ¶ 39).

OPR Investigator Avet testified: "At some point somebody in OPR, I can't say who this was, said oh, this is a Sylvester Baker guy. I recall Ernst saying at the time, we got to get this mother fucker." (PS ¶ 5). According to Avet, before Ernst made this statement, OPR investigators learned that Percy had supported Baker (*Id.*).

The events surrounding Sheriff's Police Officer David Barber in 2011 provide additional evidence that Percy was targeted for supporting Baker. In 2011, OPR Director Dyner, who headed the same OPR unit that investigated Percy, assigned OPR Investigator Hemphill to investigate Barber (PS ¶ 40). Barber was a Baker supporter (PS ¶ 41). Dyner told Hemphill that "they" wanted Barber "terminated." (PS ¶ 40). When he asked Dyner who wanted Barber fired, Hemphill testified that Dyner, "… alleged that he had had a telephone conversation with the sheriff, the undersheriff, and the chief of staff, who was Brian Towne at the time." (PS ¶ 41). The statement that the Sheriff wanted Barber fired occurred before the investigation even started (*Id.*). Hemphill feared for his

11

job if he did not reach the desired conclusion (*Id.*). When asked why Dart, Whittler and Dyner wanted Barber fired, Hemphill stated that Dyner referenced or implied that Barber had a pending racial discrimination complaint (*Id.*).

The above events are admissible under FRE 404(b) especially given the more lenient standards for opposing motions for summary judgment. *See*, *Hill v. City of Chicago*, 2011 WL 3840336 (N.D.Ill.); *Hartzol v. McDonald's Corp.*, 437 F.Supp.2d 805, 808 (N.D.Ill. 2006) (evidence presented in opposition to a motion for summary judgment must be admissible in content, though it need not be in an admissible form).

The evidence regarding Barber establishes facts at issue other than Defendants' propensity to commit the conduct in question. The evidence shows that the other acts are similar and close enough in time to be relevant to facts at issue in this case. The evidence is sufficient to support a jury finding that the Defendants committed similar acts. Here, probative value is not substantially outweighed by the danger of unfair prejudice under FRE 403. Evidence of other bad acts is admissible for other purposes including motive, intent, plan, or opportunity under FRE 404(b). *Okai v. Verfuth*, 275 F.3d 606, 610 (7th Cir. 2001). The evidence is also admissible to show preparation, knowledge, identity, or absence of mistake or accident. *See*, *Lanigan v. Babusch*, 2011 WL 5118301, at *2 (N.D.Ill.).

The similarities between Barber and Percy are striking. Both were Sheriff's Police Officers; both were Baker supporters; both investigations occurred in 2011; the results of both investigations were predetermined; Dyner headed the same OPR unit that investigated both Taylor and Barber (PS ¶ 40); Hemphill was involved in both investigations; and Dart and Whittler were personally involved in both investigations (*see* discussion *infra*). Johnson found Hemphill's testimony particularly relevant (PS ¶ 41).

When the evidence set forth in Percy's PS is considered as a whole, a jury could reasonably conclude that Percy's political affiliation was at least a motivating factor in the employment actions against him. It is difficult to reach a different conclusion given the manner in which Percy, his wife and children were treated; the shoddy nature of the investigation; the repeated acts of retaliation, including those related to the Nowacki incident, where the CCSO sought to fire Percy for allegedly grabbing Nowacki's hand, and where it was Ernst and Fitzgerald that prepared misdemeanor criminal complaints against Percy more than a month after the incident (PS ¶ 60); the Guerrero incident where the CCSO sought to fire Percy for allegedly stating that he would write Guerrero tickets and lock him up; the CCSO repeatedly moving to dismiss and reinstate the MB cases involving Nowacki and Guerrero after Percy prevailed in State Court and the Illinois Appellate Court (PS ¶¶ 68-72); and the CCSO refusing to put Percy on the payroll and to pay him the back pay and other benefits to which he is entitled to after Judge Cohen and the Illinois Appellate Court found that the October 30 2013 MB decision was void (PS ¶¶ 42-47).

The Dart Defendants are wrong that the continued acts retaliation fail to rise to an adverse employment action (Dart's MSJ, pp. 11-12). In order to show an adverse employment action, a plaintiff needs to present evidence of "some quantitative or qualitative change in the terms or conditions of his employment or some sort of real harm." *Atanus v. Perry*, 520 F.3d 662, 675 (7th Cir. 2008). "The First Amendment requires a deprivation likely to deter free speech, a standard considered more lenient that the Title VII counterpart of adverse action." *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013). "Any deprivation" can suffice "If… the circumstances are such as to make such a [deprivation] an effective deterrent to the exercise of a fragile liberty." *Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000).

The question is "often fact-specific and that sometimes even modest deprivations or threats can be sufficient to deter protected speech." *Swetlik v. Crawford*, 738 F.3d 818, 825 n.2 (7th Cir. 2013). In *Hernandez*, the Court held: "Considering this persuasive authority from the courts of appeals and the lenient nature of the standard, the Court finds that the Sheriff's Office's decision to suspend Plaintiffs with pay and initiate an investigation (whether criminal or with criminal implications) … would dissuade a reasonable person from exercising their political rights." *Hernandez*, 2017 WL 4535982, at *8.

Here, Defendants' continued acts of retaliation meet the standard for an adverse employment action. For instance, on March 18, 2013, Dart filed a Merit Board complaint related to the Guerrero incident seeking Taylor's termination (PS ¶ 66). That complaint is pending before the MB (*Id*.). OPR sustained the charges recommending termination (*Id*.). It is contrary to well-established case law to contend that this is not an adverse employment action. The Seventh Circuit defines "adverse employment actions" broadly. *Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012). "A material adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993).

Percy was also retaliated against by being denied more than $456,000 in backpay (PS ¶ 47). There is ample evidence that Percy suffered adverse employment actions to support his retaliation claims.

## IV. *PERSONAL INVOLVEMENT*

The requirement of personal involvement in the deprivation of a constitutional right "can be satisfied if the conduct causing the constitutional deprivation occurs at the defendant's direction

or with the defendant's knowledge and consent." (9/30/18 Opinion, Doc. 290, p. 5, *citing Gentry*, 65 F.3d at 561 and *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017). That is, the defendant must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1991); *Greene*, 79 F.Supp.3d at 811-12. The CCSO is subject to § 1983 liability if a plaintiff can show a constitutional injury caused or ratified by person with final policymaking authority. *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009); *Greene*, 79 F.Supp.3d at 811.

### Undersheriff Zelda Whittler

Whittler was a direct participant and had the requisite personal involvement. The Court need look no further than the April 2011 communications between Whittler and Holbrook (PS ¶ 29). Whittler and Dart wanted Percy suspended ***without pay*** (PS ¶ 30). On or about April 13, 2011, Whittler sent a letter to Holbrook stating: "Pursuant to our discussion regarding Officer Percy Taylor on April 12, 2011 and the *Loudermill* Hearing Board's recommendation, I do not concur with the recommendation of suspension with pay." (*Id*. ¶ 29).[1] Whittler copied the Sheriff's Chief of Staff and others on her letter (*Id*.). The letter confirms that Whittler personally spoke to Holbrook about Taylor. (*Id*). Whittler was also copied on an April 14, 2011, memo from attorney Maher to Taylor (PS, ¶ 32).

In a memo dated April 14, 2011, Holbrook responded to Whittler defending the *Loudermill* Board's decision stating *inter alia*: "In this particular instance, debriefing the Board members revealed that they voted their conscious [sic] based on the weaknesses of the evidence, not for want of knowing what to do." (*Id*.). Holbrook told Whittler about the problems with OPR's

---

[1] Whittler's letter is dated April 14, 2011 (PS ¶ 29). Whittler testified that there appeared to be a clerical error based on Holbrook's April 14, 2011 memorandum referencing Whittler's letter dated April 13, 2011 (*Id*.).

investigation including: the investigation left too many unanswered questions and was incomplete including Woolfolk's lengthy criminal history which "bore on the ultimate questions of 'he said, she said'"; the investigators ending their investigation when the States Attorney's office declined to pursue felony charges; the Police Department being put off time and again to requests to view the investigatory file prior to the hearing; and OPR obtaining a search warrant for the wrong address (*Id.*).

Whittler's involvement in Taylor's case is contrary to her deposition testimony where she testified that her only role in employee discipline was being the final signature on command channel review (PS ¶ 32). According to Whittler, she dealt with thousands of cases (*Id.*). It should be for the jury to decide why she took such a personal interest in Taylor.

Whittler also signed off on all three Command Channel Reviews—BB-gun, Nowacki and Guerrero incidents (PS ¶¶ 21, 65, 67). She signed Dart's name to all three MB complaints seeking Taylor's termination (*Id.* ¶¶ 33, 65, 66). John Maher, former Assistant General Counsel to the Sheriff's Police Department who attended the March 22, 2011 *Loudermill* Hearing, attests that management broke protocol by insisting that the hearing be conducted prior to the completion of OPR's investigation (PS ¶ 27). According to Johnson, conducting a *Loudermill* hearing before the investigation is completed, documented and approved, is contrary to accepted law enforcement practices and standards. (PS ¶ 28). "The scheduling of a *Loudermill* hearing before the investigation was completed and the failure to follow-up on the deficiencies demonstrate that the investigation was not only seriously flawed but strongly suggests that the outcome had been pre-determined before the investigation was completed." (PS ¶ 28).

Directly after the *Loudermill* Board determined that Percy would still be paid his regular salary, Holbrook told Deputy Chief Smith words to the effect "the Sheriff and Zelda [Whittler] are

not happy with the outcome of the Board." (PS, ¶ 30).[2] OPR's Standard Operation Procedures provide that the Undersheriff or Sheriff, or his/her designee, will make the final decision regarding the completeness of the investigation, the finding and any disciplinary action (PS ¶ 31). In this case, it was Whittler who was the final authority (PS ¶ 74). Whittler was personally involved in the actions taken against Percy.

### Sheriff Thomas Dart

Dart had sufficient personal involvement. Taylor must be permitted to proceed against Dart in his individual capacity. Maher's declaration that he heard a conversation between Holbrook and the Deputy Chief where Holbrook stated that the Sheriff is not happy with the outcome of the *Loudermill* Board shows Dart's personal involvement. Holbrook also stated, "downtown sees it one way, and we on the ground doing the job each day see it the right way." (PS ¶ 30) "Downtown" was commonly referred to and understood as the Sheriff, the Undersheriff, and the Sheriff's Chief of Staff (*Id.*).

Johnson states there is evidence that Dart was personally involved in Percy's OPR investigation (PS ¶ 41). Johnson points to the testimony of OPR Investigator Hemphill in the Barber case where OPR Director Dyner talked about a conversation with Dart in which Dart wanted Barber fired before the investigation even began because of a racial discrimination complaint (*Id. see also*, discussion *supra*, p. 11).

---

[2] On September 16, 2019, Magistrate Judge Jeffrey Gilbert denied Plaintiff's motion for reconsideration of the Court's October 24, 2017 ruling and for an order requiring Dart sit for deposition (Doc. 454). Maher's affidavit was attached to the motion for reconsideration. Defendants in their response requested the Court to enter an order excluding Maher's affidavit contending that the affidavit untimely produced, 3 months after the close of fact discovery (9/16/19 Order, p. 8). Magistrate Judge Gilbert ruled that the affidavit was untimely produced and should not be considered when deciding the motion to reconsider (*Id.*, p. 9).

Dart also filed three MB complaints against Taylor, with Whittler signing his name to the complaints (PS 21 ¶¶ 33, 65, 66). There is sufficient evidence of Dart's involvement and the jury should decide if Dart is personally liable under § 1983.

### OPR Executive Director Joseph Ways

Ways played a substantial role in, and was personally involved in, the constitutional deprivations. Ways signed off and approved OPR's Summary Reports for all three OPR investigations, *i.e.*, BB-gun, Nowacki and Guerrero (PS ¶¶ 31, 67). He signed off on all three Command Channel Reviews (*Id*). OPR's Standard Operation Procedures provide that final approval for the summary report is obtained by the Executive Director and no summary reports will be sent to Command Channel Review prior to obtaining Ways' final approval and signature (PS, ¶ 53). "Ways signed off on the findings and [Ways] recommended Taylor's termination in spite of a seriously flawed investigation that [he] had an obligation and responsibility to ensure was fair, unbiased, thorough and complete." (*Id.*).

In addition, Ways was the sole person responsible for recommending discipline (PS ¶ 73). Ways sustained the charges, recommended termination, signed off on the OPR Summary and the Command Channel Review despite not knowing if OPR was equipped to investigate the March 8, 2011 incident (PS ¶ 20). Ways didn't even know if he would have approved an investigation containing weaknesses (PS ¶ 50). There is no basis to dismiss Ways from this case.

### Gregory Ernst and Patrick Fitzgerald

Not much more needs to be said about Ernst and Fitzgerald's involvement. Fitzgerald and Ernst exhibited extreme racial animus and hatred towards Percy. There is evidence that Ernst falsified the complaint for a search warrant. Ernst threatened Percy stating: "You better quit, nigger." After Percy denied the allegations, he was arrested on the spot, without any investigation, aside from Ernst and Fitzgerald speaking to Woolfolk and Wolfe (Wolfe did not witness the

18

incident) (PS ¶ 12). Murphy asked Ernst and Fitzgerald to detain Percy (*Id*.). He was placed in the vehicle, handcuffed and not free to leave (*Id*.). Ernst held Percy in custody and interrogated him for 30 hours, paraded Percy in handcuffs in front of his peers and handcuffed him to a table (PS ¶ 13). Ernst said: "we got to get this mother fucker" when an OPR investigator said, "this is a Sylvester Baker guy". Fitzgerald called Percy an "nigger" and pointed a gun at Percy's wife. Ernst prepared a biased OPR Summary Report used for the rubber stamped CCR, intentionally ignoring exculpatory evidence with no mention that no weapon or projectiles were recovered and no mention of Woolfolk extensive criminal history. These are just a sampling of Ernst and Fitzgerald's personal involvement.

***Patrick Murphy***

Murphy was OPR's Assistant Director who assigned Ernst to investigate Taylor (PS ¶ 12). Ernst was the lead investigator under Murphy's direction (*Id*. ¶ 12). Murphy was personally involved in the investigation and was one of the investigators at Taylor's residence when Percy was arrested by Ernst and handcuffed by Fitzgerald (*Id*.).

As to each defendant, the facts are such that a jury could reasonably conclude that the misconduct occurred at their direction or with their knowledge and consent. A jury could find that each of the Defendants facilitated, approved, condoned, or turned a blind eye to the misconduct.

## V. *DEFENDANTS' PROBABLE CAUSE ARGUMENT IS WITHOUT MERIT*

Defendants again try to avoid liability contending that they had probable cause to arrest Taylor. The Court rejected Defendants' probable cause argument in the context of their motion to dismiss noting: "When there is room for differences of opinion on facts or reasonable inferences, the probable cause question should be determined by a jury." (9/30/18 Opinion, p. 9, Doc. 290; *citing Mucha v. Village of Oak Brook*, 650 F.3d 1053, 1057 (7th Cir. 2011). Probable cause is typically a question of fact for the jury. *Moore v. Marketplace Rest., Inc.*, 754 F.2d 1336, 1348 (7th

Cir. 1985); *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1983) (probable cause is proper issue for the jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them).

In *Moore*, after a restaurant owner complained that the plaintiffs had refused to pay, the police went to the plaintiffs' homes and arrested them after determining only that they had been in the restaurant that day. The court held there was no probable cause to arrest as the police had not conducted a real investigation and there were no exigent circumstances justifying such summary action. The crime was not particularly serious, the plaintiffs were not dangerous, and they were not fleeing the scene. The arrest could have been avoided had the police conducted a proper investigation. Summary judgment for the police was improper. *Moore*, 754 F.2d at 1345-46.

There is no legitimate reason why an adequate investigation was not undertaken prior to Percy's arrest, and this is, at a minimum, a question of fact for the jury. There is no evidence that Percy was a danger to the community, having been a law-abiding police officer. On March 9, 2011, before the arrest, when questioned by Ernst, Percy denied "committing those acts." A jury could certainly conclude that, had there been a proper investigation, probable cause was lacking.

A jury could reasonably conclude that Percy's arrest was based on the racial animus of Ernst, Fitzgerald and others at the CCSO or for political retaliation or both. Self-serving denials do not wipe away the racial hatred exhibited by these OPR investigators, interrogating Percy for 30-hours, parading him around in handcuffs in front of his peers, calling Percy and his wife the "N word," terrorizing his wife and their children, sustaining the charges days after the start of the investigation and the biased and shoddy investigation that failed to meet minimum standards as set forth in Johnson's report. Because no weapon or projectiles were recovered, and no

corroborating evidence backed up Woolfolk's allegations, and given Woolfolk's illogical account, including hearing a "poof," a jury could find that there was no probable cause to arrest Percy.

The fact that the Chicago Police Department ("CPD"), who first investigated the incident on March 8, 2011, made no arrests supports an inference of lack of probable cause (PS ¶ 17). According to Mary Wolfe, the two CPD officers who initially responded to her call did not seem too interested in doing anything about what she said happened (*Id.*). "[Woolfolk] was telling them that he's over there now. They refused to go." (*Id.*). The CPD advised Wolfe and Woolfolk of "warrant and order of protection procedures." (*Id.*).

Moreover, there is evidence from which a jury could infer that Ernst falsified the complaint for a search warrant by falsely stating that Taylor throughout the interview changed the versions of his whereabouts on March 8, 2011 (PS ¶ 14). However, Ernst's report of Taylor's interview makes no such mention (*Id*). According to Johnson, Ernst is either guilty of unethical police practices or "very poor reporting." (*Id.*).

Even if a jury were to conclude that probable cause existed for the initial arrest, probable cause does not shield the Defendants from liability for their many other wrongful acts. Defendants' probable cause argument is without merit. Probable cause is a defense to a § 1983 wrongful arrest claim. *Chelios v. Heavener*, 520 F.3d 678, 685-86 (7th Cir. 2008); *Thurman v. Vill. of Hazel Crest*, 570 F.Supp. 1019, 1027 (N.D. Ill. 2008). Percy's claims involve much more than wrongful arrest.

## VI.   *DART DEFENDANTS FAIL TO SATISFY THEIR INITIAL BURDEN FOR ARGUMENTS G THROUGH K*

The Dart Defendants take a shotgun approach for Arguments G-K (Def. Mot., p. 15). Defendants merely make bald assertions with no evidence. For instance, the entirety of Argument J is that "[m]any of the alleged retaliatory acts were not encompassed in an EEOC complaint and/or the claims were untimely filed (*Id.*).

"[I]t is not this court's responsibility to research and construct the parties' arguments." *APS Sports Collectibles, Inc. v. Sports Time, Inc.,* 299 F.3d 624, 631 (7th Cir. 2002). To meet their burden for summary judgment, Defendants must rely on more than bald assertions or bare pleadings. *EEOC v. MTC Gear Corp.*, 595 F.Supp. 712, 716 (N.D. Ill. 1984). Defendants bear the burden to establish the basis for their motion with evidence demonstrating the absence of any genuine issue of material fact. *Hanover Ins. Co. v. N. Bldg., Co.*, 891 F.Supp.2d 1019, 1025 (N.D. Ill. 2012). When the moving party fails to meet its strict burden of proof, summary judgment cannot be entered, even if the opposing party fails to respond to the motion. *Gerhartz v. Richert*, 779 F.3d 682, 686, n. 8 (7th Cir. 2015). Hence, the Dart Defendants' motion for summary judgment as to Arguments G-K must be summarily denied.

## VII. § 1983 CONSPIRACY

The Dart Defendants' argument as to Percy's § 1983 conspiracy claims in Count VI consists of one sentence: "Since there is [sic] no underlying constitutional violations, Defendants are entitled to judgment on Plaintiff's conspiracy claim. *See Hill v. Shobe*, 93 F.3d 418, 422 (7th Cir. 1996)." (Def. Mtn. p. 15). This argument must be rejected on its face. As discussed *supra*, there are genuine issues of material fact of underlying constitutional violations including First Amendment retaliation claims; racial discrimination claims and other constitutional claims under § 1983.

## VIII. STATUTE OF LIMITATIONS

Based on the two-year statute of limitations for civil rights claims, Defendants Ways and Whittler argue that because Percy did not sue them until July 6, 2015, his claims are time-barred. (Mot., p. 15). As discussed *supra*, the Court should not consider this argument for Defendants' failure to meet their strict burden of proof for summary judgment. Regardless, there is no merit to the argument. The Court denied Defendants Ways and Whittler's 12(b)(6) motion in which they

claimed Taylor's § 1983 claims were time-barred (9/30/18 Opinion, pp. 14-15, Doc. 290). This

Court stated in pertinent part:

> The limitations period for § 1983 claims is based on state law—in Illinois, it is two
> years. *O'Gorman v. City of Chi.*, 777 F.3d 885, 889 (7th Cir. 2015). But the date
> on which the claim accrues (and thus the limitations period starts) is a matter of
> federal law and generally occurs when a plaintiff knows the fact and the cause of
> an injury. *Id.* The accrual determination is a twostep process: the court first
> identifies the injury and then determines when the plaintiff could have sued for that
> injury. *Draper v. Martin*, 664 F.3d 1110, 1113 (7th Cir. 2011). The running of the
> statute of limitations is an affirmative defense and dismissal of a complaint on such
> grounds is typically improper. *See Reiser v. Residential Funding Corp.*, 380 F.3d
> 1027, 1030 (7th Cir. 2004) …
>
> At this stage, it is not clear (and the parties have not identified in their briefs) when
> Taylor's claims accrued. For example, for the filing of the March 2013 Merit Board
> complaint, it is unclear when Taylor knew the fact and the cause of his injury. The
> same is true for the claims related to the other events. Further, the TAC alleges that
> some of Smith, Ways, and Whittler's actions, such as their ratification of the sham
> investigation and recommendation of Taylor's dismissal, happened in 2014. (TAC
> ¶ 76.) Hence, the Court cannot conclude that Taylor's § 1983 claims are time-barred
> based on the allegations in the TAC.

(*Id.*).

The same reasoning applies to the motion for summary judgment. Because the statute of

limitations is an affirmative defense, it is Defendants' burden to establish that the claim is time-

barred. *Taylor v. City of Chicago*, 80 F.Supp.3d 817, 824 (N.D. Ill. 2015). Defendants' two

sentence argument fails to establish that any of Plaintiff's claims are time-barred.

Additionally, the limitations period starts with clear notice of a final decision to terminate

without further process. *Lawshe v. Simpson*, 16 F.3d 1475, 1478 (7th Cir. 1994). In this case, clear

notice of a final decision to terminate without further process occurred at the earliest on October

30, 2013, when the MB issued its decision (PS ¶ 42). This is within two years of filing suit against

these individuals on July 6, 2015. Learning of the acts of retaliation and discrimination occurred

after July 6, 2013. These acts include the refusal to provide Taylor with back pay and reinstatement

after Judge Cohen declared the MB decision void (*Id.*); learning of the racial slurs and clear

evidence of political retaliation for supporting Baker from Avet's State Court deposition taken on November 23, 2015 (PS ¶¶ 1, 2, 5); the fact that Defendants' acts of discrimination and retaliation are ongoing and continuing; and Taylor's on-going conspiracy claims under § 1983.

"Under federal law, the discovery rule 'starts the statute of limitations running only when the plaintiff learns that he has been injured, and by whom.'" *CBS Outdoor, Inc. v. Village of Plainfield*, 959 F.Supp.2d 1054, 1062 (N.D. Ill. 2013), *quoting United States v. Norwood*, 602 F.3d 830, 837 (7th Cir. 2010). The discovery rule is a fact-intensive inquiry, in which both the surrounding circumstances and the claims plaintiff is trying to raise are critical. *Hileman v. Maze*, 367 F.3d 694, 697 (7th Cir. 2004).

Taylor did not learn of the gross deficiencies of the investigation, and of Whittler and Ways' ratification of the investigation and findings, until after engaging in discovery in the underlying case filed on March 8, 2013. Taylor's claims are not barred by the statute of limitations.

## IX. *DEFENDANTS' QUALIFIED IMMUNITY ARGUMENT IS NOT WELL-TAKEN*
### *Ernst Defendants' Qualified Immunity Argument*

The Ernst Defendants' qualified immunity argument rests entirely upon the assertion that they had probable cause to arrest and search (Ernst MSJ, pp. 13-14). As set forth in Section V, probable cause is a question of fact for the jury to determine. The test for qualified immunity is whether: (1) the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) the constitutional right was clearly established at the time of the alleged violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Even if the Ernst Defendants had probable cause for the arrest, it would only shield them from liability for the arrest and not from their subsequent wrongful acts and therefore provides no basis for summary judgment.

Regarding the second prong of the qualified immunity analysis, Percy's constitutional right not to be arrested ***without probable*** cause was clearly established at the time of the alleged

violations. *Moore v. Marketplace Rest., Inc.*, 754 F.2d 1336, 1348 (7th Cir. 1985); *Chelios v. Heavener*, 520 F.3d 678 (7th Cir. 2008); *Thurman v. Village of Hazel Crest*, 570 F.Supp. 1019 (N.D. Ill. 2008).

*Chelios, Moore*, *Thurman* and decades of precedent establish that Percy's constitutional rights were clearly established on the issue of probable cause. In *Chelios*, a police sergeant claimed that the plaintiff poked him in the chin with his outstretched finger. *Chelios*, 520 F.3d at 683. The sergeant arrested the plaintiff, transported him to station, and the state filed a misdemeanor criminal complaint. *Id*. Defendants moved for summary judgment on the § 1983 unlawful arrest based on probable cause. The Seventh Circuit noted that whether the plaintiff poked the sergeant in the chin was a fact critical to the § 1983 claim. *Id*., p. 686. "If Mr. Chelios made contact with Sergeant Heavener, then Sergeant Heavener had probable cause to arrest him for having committed an aggravated battery under Illinois law." *Id*. The plaintiff denied making any contact with the sergeant. *Id*., pp. 686-87. The Seventh Circuit held:

> Because there is a dispute as to whether Mr. Chelios ever made physical contact with Sergeant Heavener, the district court erred in ruling, as a matter of law, that Sergeant Heavener had probable cause to arrest Mr. Chelios for aggravated battery under Illinois law. Such a ruling could be support only if the facts and all reasonable inferences were construed *against* Mr. Chelios, a methodology that contravenes well-established summary judgment standards.

*Chelios*, 520 F.3d at 688.

The Seventh Circuit also denied summary judgment based on qualified immunity:

> When the facts of this case are taken in the light most favorable to him, Mr. Chelios has shown that Sergeant Heavener violated his constitutional rights by arresting him without probable cause. Moreover, given that, under his version of the facts, Mr. Chelios had not made physical contact with Sergeant Heavener… we believe that case law would have put him on notice that Mr. Chelios had a right to be free from arrest under the particular circumstances of this case.

*Chelios*, 520 F.3d at 691.

Like the Plaintiff in *Chelios*, Percy denies that he committed the alleged acts. On March 9, 2011, before the arrest, Ernst asked Percy questions about whether he had committed the acts and

Percy "denied committing those acts." (PS ¶ 12). After Percy denied the allegations, he was arrested on the spot, without any investigation, aside from Ernst and Fitzgerald speaking to Woolfolk and Wolfe (Wolfe did not witness the incident) (*Id*). Murphy asked Ernst and Fitzgerald to detain Percy (*Id*). He was placed in the vehicle, handcuffed and not free to leave (*Id*.). Based on *Chelios* and other authority cited herein, questions of fact exist as to whether Ernst and Fitzgerald had probable cause to arrest Percy, which questions of fact also preclude summary judgment based on qualified immunity.

Similarly, in *Thurman*, the Court held fact issues precluded summary judgment on a false arrest claim based on qualified immunity. *Thurman*, 570 F.Supp.2d at 1028. As discussed in detail *supra*, *Moore* is closely analogous for purposes of qualified immunity. It cannot be said that the constitutional requirement of probable cause was not clearly established in 2011. A reasonable jury could reasonably find that Ernst and Fitzgerald lacked probable cause to arrest Taylor without any meaningful investigation. No exigent circumstances existed. Percy was not a flight risk being a 16-year veteran police officer with the Sheriff's Police Department. A jury could reasonably conclude that it was unreasonable to accept Woolfolk's story, an individual with questionable character, at face value with no corroborating evidence, without any investigation.

### Dart Defendants' Qualified Immunity Argument

The Dart Defendants' argue that qualified immunity precludes § 1983 claims "because there is sufficient evidence of misconduct." (Dart's MSJ, pp. 5-8). Taking a shotgun approach, Defendants lay out a list of disputed questions of fact trying to disparage Percy's character including claiming that Percy assaulted Nowacki, charges on which he was found not guilty after a bench trial (PS ¶ 63).

Defendants cite *Hernandez v. Sheahan*, 711 F.3d 816 (7th Cir. 2011), a case where the court found it objectively reasonable for prison officials to investigate correctional officers implicated

in a multi-felon major jailbreak. In that case, the Seventh Circuit in *dicta* stated: "due to the fact that the authorities had probable cause to investigate the Officers, we are less concerned about other possible motivations for their treatment." *Hernandez*, 711 F.3d at 818. That case has no relevance here.

Defendants cite to OPR's sham investigation arguing that the investigation proves that they were justified in violating Percy's constitutional rights. Defendants make the conclusory claim, that "[b]ecause the record is rife with evidence of misconduct, the Executive Defendants were well within their means to investigate and address it." (Dart's MSJ, pp. 7-8). Defendants' qualified immunity argument is not supported by law or fact and must be denied.

## X. OTHER ARGUMENTS/ASSERTIONS BY DEFENDANTS

### False and/or Misleading Statements about Circuit Court Backpay Litigation

The Dart Defendants make false and/or misleading statements concerning the Circuit Court litigation before Judge Cohen, not-the-least of which is the claim that the Circuit Court repeatedly denied Plaintiff's requests for reinstatement and backpay (Def. Mot., p. 3). This is simply untrue as Percy sets forth in his pending Motion for Partial Summary Judgment and in the Reply (Docs. 418, 419, 433 & 434).

The Circuit Court never rejected Taylor's argument that the *status quo* required Taylor to be returned to the payroll and provided backpay. Just the opposite, on August 15, 2019, Judge Cohen ruled that Percy is entitled to backpay regardless of whether he ultimately prevails on the charges before the MB (PS ¶ 45). The Circuit Court also never ruled that Percy is not entitled to be returned to the payroll. On August 22, 2019, Judge Cohen stated: "I do have an opinion on that … And I think one follows the other, to be quite honest. But let's wait and see." (*Id.*).

On September 25, 2019, the Illinois Supreme Court granted the Sheriff's petition for leave to appeal in *Goral v. Dart*, 132 N.E.3d 368 (Table) (Ill. 2019). On October 11, 2019, Judge Cohen,

*sua sponte*, stayed all pending motions pending the appeal in *Goral v. Dart* (PS ¶ 46). Twice, the Illinois Supreme denied the Sheriff's petition for leave to appeal Judge Cohen's decision holding that the October 30, 2013 Merit Board decision was void. *Taylor v. Dart*, 77 N.E.3d 86 (Table) (Ill. 1/25/17); *Taylor v. Dart*, 89 N.E.3d 764 (Table) (Ill. 9/27/17). Thus, Defendants are wrong that the Circuit Court repeatedly denied Percy's requests for backpay and reinstatement.

### The Defendants' Improperly Rely on a Void MB Decision and a Circuit Court Decision that was Withdrawn and is of No Effect

It is improper for the Dart Defendants to cite to the Merit Board's October 30, 2013 decision and the circuit court order of May 7, 2014 which purports to affirm the October 30, 2013 MB order. Judge Cohen and the Appellate Court ruled that the October 30, 2013 MB order is void (PS ¶ 42; *Taylor v. Dart*, 2017 IL App (1st) 143684-B, ¶¶ 55-56). Defendants fail to mention that on November 25, 2014, the circuit court withdrew its memorandum and order entered on May 7, 2014 and stated that the order "is of no effect." (PS ¶ 42).

### Defendants Misstate Brown v. County of Cook, 661 F.3d 333 (7th Cir. 2011) for Percy's First Amendment Claims

The Dart Defendants are incorrect that even if Percy can demonstrate that the Defendants were aware of his support for Baker, they are still entitled to summary judgment "because Plaintiff fired a pellet rifle at an unarmed neighbor." Defendants cite *Brown v. Cty. of Cook*, 661 F.3d 333 (7th Cir. 2011) for the proposition that "any nonpolitical ground causing the discrimination will preclude liability." (Dart's MSJ, p. 14). *Brown* does not stand for such a proposition. The Seventh Circuit stated: "***If all that's charged is discrimination on political grounds***, any nonpolitical ground ***that the defendant can prove*** would have caused the discrimination regardless of the presence of political hostility will preclude liability." *Brown*, 661 F.3d at 337.

Taylor charges more than discrimination on political grounds. Further, *Brown* requires Defendants to prove a nonpolitical ground for this statement to apply. Percy denies firing a pellet

gun at an unarmed neighbor and there is overwhelming evidence to support Percy's claim, including evidence that disproves Woolfolk's story based on the direction the vehicle was facing according to Mary Wolfe (PS ¶¶ 24, 25).

***Defendants were Aware of Percy's Complaints in this Case at the time the MB Complaint was filed about the Guerrero Incident***

The Dart Defendants argue that Percy's retaliation claims for filing the MB complaint stemming from the Guerrero incident fail because "there is no evidence that anyone at the CCSO including Undersheriff Whittler had knowledge of Plaintiff's lawsuit at the time of filing." (Dart's MSJ, p. 12). This lawsuit was filed on March 8, 2013[3] and Defendants argue that the Sheriff Office was served on June 10, 2013 (*Id.*). Defendants ignore the fact that Percy filed his Charge of Discrimination against the CCSO on November 18, 2011 (PS ¶ 6).

Additionally, Percy filed complaints against the CCSO prior to March 2011. On October 2, 2009, Percy filed a Charge of racial discrimination with the Illinois Department of Human Rights and the EEOC (*Id.*). Percy also filed a Shakman complaint, referred to in a letter dated August 27, 2009, against the CCSO related to allegations of unlawful political action (*Id.*).

Dart filed the MB complaint for the Guerrero incident on March 18, 2013. There is no question that the CCSO knew about Percy's prior EEOC charges and Shakman complaint prior to this time. Also, the CCSO likely knew about the instant lawsuit if the CCSO monitors lawsuits filed against it. With respect to the Nowacki incident, OPR prepared and had Deputy Sheriff DeCook file a misdemeanor criminal complaint against Taylor on or about February 26, 2012 (PS ¶ 61). Defendants have offered no basis for summary judgment on Percy's retaliation claims.

***Malicious Prosecution***

---

[3] Defendants incorrectly state that this lawsuit was filed on March 18, 2013 (Def. Mot., p. 12) when in fact Percy's filed the underlying lawsuit on March 8, 2013 (Doc. 1).

The criminal proceedings ended with conclusive evidence of innocence; a finding of not guilty. The facts show and Percy will prove that Ernst and Fitzgerald caused and procured the criminal complaints and his arrest.  The facts show and Percy will prove that Ernst and Fitzgerald acted without probable cause, (*See,* discussion on probable cause, *supra)*; that is that they did not have an honest belief that Percy committed the offenses charged; and, Percy will prove that Defendants Ernst and Fitzgerald acted with malice. *See*, *Swick v. Liautaud*, 169 Ill.2d 504, 512 (1996).[4]

***Cook County's Motion for Summary Judgment Must be Denied***

Cook County's premise is that because the Dart and Ernst Defendants are not liable, the County is not liable. For the reasons set forth above, Cook County's motion must be denied.

**WHEREFORE,** Plaintiff, Percy Taylor, requests that this Honorable Court deny Defendants' Motions for Summary Judgment in their entirety and grant him any other relief the Court deems appropriate.

**PERCY R. TAYLOR**

*s/ Richard F. Linden*
One of Plaintiff's attorneys

---

[4] Regarding Defendants' claim that Percy paid "restitution" see Plaintiff's Response to Dart Defendants Statement of Facts, ¶ 18. Restitution is a legal term, *see* 730 ILCS 5/5-5-6. Restitution is ordered by the Court. (*Id.*). In this case there is no order of the Court requiring Percy to pay restitution. Percy denies paying Wolfe any money. But even if he did, because there is no Court Order such payment cannot be called restitution. Accordingly, any payment would have been in settlement of disputed claims and is inadmissible at the trial of this case pursuant to Rule 408 of the Federal Rules of Evidence.